IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
v.                              )       No. 3:10-CR-159
                                )
KEVIN TRENT BUSSELL,            )       (VARLAN/SHIRLEY)
GENEVA BUSSELL,                 )
NICOLE SEAL, and                )
JESSICA WILSON,                 )
                                )
            Defendants.         )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate. This case is before the Court on eight pending motions to suppress

the evidence seized in the execution of search warrants:

> (1) Defendant Leonard Bussell's Motion to Suppress Evidence
> Seized from 445 Moody Hill Road [Doc. 172], filed on March 11,
> 2011;
>
> (2) Motion to Suppress [Doc. 179], filed on March 11, 2011, by
> Defendant Jessica Wilson;
>
> (3) Motion to Suppress [Doc. 195], filed on March 18, 2011, by
> Defendant Nichole Seal;
>
> (4) Motion to Suppress No. 1 [Doc. 204], filed on March 25, 2011,
> by Defendant Kevin Trent Bussell;
>
> (5) Motion to Suppress No. 2 [Doc. 205], filed on March 25, 2011,
> by Defendant Kevin Trent Bussell;

1

(6) Motion to Suppress No. 3 [Doc. 206], filed on March 25, 2011, by Defendant Kevin Trent Bussell;

(7) Motion to Suppress No. 4 [Doc. 207], filed on March 25, 2011, by Defendant Kevin Trent Bussell; and

(8) Motion to Suppress No. 5 [Doc. 209], filed on March 25, 2011, by Defendant Kevin Trent Bussell.

Defendant Geneva Bussell was permitted [Doc. 343] to join in the motion [Doc. 172] by Leonard Bussell[1] and three of the motions [Docs. 204, 205, and 207] filed by Defendant Kevin Trent Bussell. The parties appeared before the undersigned for a motion hearing on May 13, 2011. Assistant United States Attorney Alexandra Hui appeared on behalf of the Government. The following defense counsel were present, along with their clients: Attorney John E. Eldridge, representing Defendant Kevin Trent Bussell; Attorney G. Scott Green, representing Defendant Leonard King Bussell; Attorney Tommy K. Hindman, representing Defendant Geneva Bussell; Attorney Jonathan D. Cooper, representing Defendant Nicole Seal; and Attorney Robert R. Kurtz, representing Defendant Jessica Wilson. After hearing the arguments of the parties, the Court took the motions under advisement.

---

[1]Defendant Leonard Bussell died on October 6, 2011 [Ex. 1 to Doc. 346]. Counsel for Defendant Leonard Bussell filed a Motion to Dismiss by Reason of Abatement on October 24, 2011 [Doc. 345]. The case was abated [Doc. 353] with regard to Defendant Leonard Bussell on December 2, 2011. While the instant motion to suppress is no longer relevant to Defendant Leonard Bussell's case, the findings of the Court in this Report and Recommendation shall apply to Defendant Geneva Bussell, who was permitted [Doc. 343] to adopt this motion by Defendant Leonard Bussell. Although Defendant Kevin Trent Bussell was also permitted [Doc. 343] to adopt Defendant Leonard Bussell's motion, Kevin Bussell has failed to show that he has a legitimate privacy interest in Leonard and Geneva Bussell's residence, which is the subject of the motion.

2

## II. BACKGROUND

The Defendants are charged in varying counts of a seven-count Indictment [Doc. 3] with conspiracy to distribute controlled substances, possession of controlled substances with the intent to distribute, firearms offenses, and conspiracy to launder drug proceeds. The suppression issues arise out of numerous searches of residences and a houseboat in Tennessee and Florida in November 2010. On November 18, 2010, Internal Revenue Service (IRS) Special Agent Richard T. Nelson presented a "Master Affidavit" to United States Magistrate Judge H. Bruce Guyton in support of search warrants to search residences in Tazewell, Tennessee, and a houseboat in Speedwell, Tennessee. On November 23, 2010, law enforcement officers searched the following pursuant to search warrants supported by the Master Affidavit: Leonard and Geneva Bussell's residence at 445 Moody Hill Road, Tazewell, Tennessee; Kevin Trent Bussell's residence at 439 Moody Hill Road, Tazewell, Tennessee; and Kevin Trent Bussell's houseboat in Speedwell, Tennessee.

Also, on November 18, 2010, Agent Nelson obtained nine seizure warrants for items of Kevin Trent Bussell's personal property (vehicles, boats, and jet skis), which Agent Nelson believed would be subject to forfeiture. These nine seizure warrants were also based upon Agent Nelson's Master Affidavit. On November 22, 2010, IRS Agent Brian Grove obtained a seizure warrant for a turquoise BMW belonging to Kevin Trent Bussell. In support of this seizure warrant, Agent Grove provided an affidavit. These ten vehicles and watercraft were seized on November 23, 2010.

On November 19, 2010, IRS Special Agent Danielle Barto obtained two search warrants, from United States Magistrate Judge Anthoney E. Porcelli in the Middle District of

Florida, based upon her affidavit ("Barto Affidavit"). These search warrants authorized the search of two residences, 6065 and 6081 38th Avenue North, St. Petersburg, Florida, both belonging to Kevin Trent Bussell. Law enforcement searched these houses on November 23, 2010.

On November 26, 2010, Agent Melvin Bayless of the 8th Judicial Drug Task Force presented a single affidavit to Claiborne County Sessions Judge Robert M. Estep in support of search warrants for the residences of Nicole Seal at 1248 Dogwood Road, Tazewell, Tennessee, and Jessica Wilson at 207 Makalley Lane, Tazewell, Tennessee. Officers executed both of these search warrants on that same day.

## II. POSITIONS OF THE PARTIES

Defendant Kevin Trent Bussell asks the Court to suppress all evidence seized during the November 23, 2010 searches of his home, 439 Moody Hill Road, in Tazewell, Tennessee [Doc. 204], his houseboat [Doc. 205], and his two residences in St. Petersburg, Florida [Docs. 206 and 207]. He argues that these searches violated his rights under the Fourth Amendment because (1) the issuing judge did not have probable cause to issue the search warrants because there was no nexus between the property to be searched and the criminal activity alleged, (2) the search warrants are overly broad because they permit the executing officers to search and to seize any and all items in the various properties; (3) the search warrants were improperly executed because the agents seized items outside the scope of the search warrants, and (4) the search warrants do not state the time they were executed in violation of Rule 41 of the Federal Rules of Criminal Procedure.

Defendant Geneva Bussell[2] moves [Doc. 172] for the suppression of all evidence seized during the November 23, 2010 search of her residence, 445 Moody Hill Road, Tazewell, Tennessee. She contends that the Master Affidavit fails to provide probable cause for the search warrant because (1) the information in the affidavit is stale, (2) the information in the affidavit is conclusory and unreliable, and (3) no nexus exists between the alleged criminal activity and her residence.[3] Defendant Geneva Bussell also joins [Docs. 252 and 343] in Defendant Kevin Trent Bussell's contention that the search warrant is overly broad because it permits the executing officers to search and to seize any and all items in her home.

Defendant Nicole Seal asks [Doc. 195] the Court to suppress all evidence gained in the November 26, 2010 search of her residence, 1248 Dogwood Road, Tazewell, Tennessee. She contends that the affidavit supporting the search warrant fails to provide probable cause to issue the search warrant because it fails (1) to show the reliability of two confidential sources and (2) to demonstrate a nexus between her residence and the criminal activity alleged.

Defendant Jessica Wilson [Doc. 179] moves for the suppression of all evidence gained in the November 26, 2010 search of her residence, 207 Makalley Lane, Tazewell, Tennessee. She also argues that the supporting affidavit fails to provide probable cause for three primary reasons: (1) the affidavit does not establish a nexus existed at the time of the search between her

---

[2]These arguments are actually made by Defendant Leonard Bussell and adopted by Defendant Geneva Bussell. For purposes of this report, the Court will discuss the arguments as if advocated solely by Defendant Geneva Bussell, because Defendant Leonard Bussell is deceased.

[3]Defendant Geneva Bussell also argues that information gained through improperly authorized wire taps cannot be considered as part of the probable cause equation. The Court has considered and recommended the denial of the Defendants' motion to suppress evidence gained pursuant to the wire taps in a separate Report and Recommendation [Doc. 349].

5

residence and the criminal activity alleged, (2) the information from the affiant is conclusory and uncorroborated, and (3) the affiant omitted information material to the reliability of a confidential informant. With regard to this third argument, she requests that the Court permit an evidentiary hearing.

Defendant Kevin Trent Bussell also contends [Doc. 209] that ten articles of his personal property (vehicles, boats, and jet ski's) must be suppressed as "fruit of the poisonous tree" because they were seized as a result of the illegal searches of his Tennessee and Florida residences and his houseboat.

The Government opposes [Docs. 218, 219, 220, 223, 225, and 226] all of the motions to suppress, contending that the supporting affidavits contain probable cause to support the search of each of the residences, that the search warrants for Kevin Trent Bussell's and Geneva Bussell's residences sufficiently particularized the items to be seized, and that the search warrant for Kevin Trent Bussell's Tennessee residence was properly executed. Finally, the Government also argues that the ten items of Defendant Kevin Trent Bussell's personal property were properly seized pursuant to seizure warrants.

## III. ANALYSIS

The Fourth Amendment requires that "[n]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. The Defendants argue that their rights under the Fourth Amendment were violated because the search warrants were not supported by

probable cause.  Additionally, Defendants Kevin Trent Bussell and Geneva Bussell[4] contend that

the search warrants for their residences lack particularity.  Finally, Defendant Kevin Trent Bussell

challenges the execution of the search warrants for his residences and houseboat.  The Court will

address these three issues–probable cause, particularity, and execution–each in turn.  Finally, the

Court will take up Defendant Kevin Trent Bussell's contention that ten of his vehicles and watercraft

must be returned to him as fruit of the poisonous tree.

## A. Probable Cause

As set out above, the Fourth Amendment requires probable cause for the issuance of

a search warrant.  Probable cause to search is "a fair probability that contraband or evidence of a

crime will be found in a particular place."  <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  To make

such a showing  "requires only a probability or substantial chance of criminal activity, not an actual

showing of such activity."  <u>Id.</u> at 244 n.13.  Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely
> requires that the facts available to the officer would "warrant a man
> of reasonable caution in the belief," <u>Carroll v. United States</u>, 267 U.S.
> 132, 162, . . . (1925), that certain items may be contraband or stolen
> property or useful as evidence of a crime; it does not demand any
> showing that such a belief be correct or more likely true than false.
> A "practical, nontechnical" probability that incriminating evidence

---

[4]Defendant Geneva Bussell has moved [Doc. 252] and was permitted [Doc. 343] to adopt the motions to suppress made by Defendant Kevin Trent Bussell.  Although Geneva Bussell has no apparent legitimate privacy interest in Kevin Trent Bussell's residences and houseboat, she asks to join in Kevin Trent Bussell's factual and legal arguments regarding the "deficiency and overbreadth" of the Master Affidavit, which also supported the search warrant issued for her residence.  Accordingly, the Court will deem Geneva Bussell to be making the same arguments as Kevin Trent Bussell, where relevant.  The Court does not deem Geneva Bussell to be joining in the allegations regarding the execution of the search warrant at her residence, because she points to no items that she contends were seized outside of the scope of the search warrant.

> is involved is all that is required.  Brinegar v. United States, 338 U.S.
> 160, 176, . . . (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983).  In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion."  United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990).  Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances.  Gates, 462 U.S. at 238.

The issuing judge's determination that probable cause exists is entitled to "'great deference.'"  United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236).  This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches.  Id.  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Gates, 462 U.S. at 238.  The "duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."  Id. at 238-39.

In the instant case, all four defendants argue that the supporting affidavits failed to provide probable cause for the issuance of the search warrants for their homes and houseboat.  The Court will examine the four corners of the various affidavits to determine whether probable cause exists to support the search of (1) Defendant Kevin Trent Bussell's Tennessee residence and the surrounding acreage and his houseboat (Master Affidavit), (2) Defendant Geneva Bussell's residence (Master Affidavit), (3) Defendant Kevin Trent Bussell's Florida residences (Barto Affidavit), (4) Defendant Nicole Seal's residence (Bayless Affidavit), and (5) Defendant Jessica Wilson's residence (Bayless Affidavit).

8

*(1) Defendant Kevin Trent Bussell's Tennessee Residence, the Surrounding Acreage, and his Houseboat*

Defendant Kevin Trent Bussell contends [Docs. 204 and 205] that the Master Affidavit by IRS Special Agent Richard T. Nelson fails to provide probable cause to support the search of his Tennessee residence, the surrounding wooded acreage,[5] and his houseboat. Specifically, he argues that the Master Affidavit fails to show a nexus between his residence, the wooded parcel, or the houseboat and the alleged criminal activity. He also contends that the Master Affidavit does not show that the confidential informants are reliable or show that law enforcement

---

[5]Defendant Kevin Trent Bussell seeks to suppress the evidence seized in the search of his residence (439 Moody Hill Road), his parents' residence (445 Moody Hill Road), his grandmother's residence (443 Moody Hill Road), and a 10.5 acre parcel adjacent to these houses and owned by his parents. The Defendant summarily states in a footnote [Doc. 204, p.1, n.1] that he has a reasonable expectation of privacy in these properties. In order to contest whether a search comports with the Fourth Amendment, the defendant must have "a reasonable expectation of privacy" in the location searched. Rakas v. Illinois, 439 U.S. 128, 143 (1978). "It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001). Whether the defendant enjoys a reasonable expectation of privacy does not turn solely upon the defendant's subjective belief but also depends upon (1) the defendant's interest in and control of the place searched, (2) any measures the defendant took to ensure privacy, and (3) whether society recognizes the defendant's expectation as reasonable. United States v. Padin, 787 F.2d 1071, 1075-76 (6th Cir.), cert. denied, 479 U.S. 823 (1986). In the instant case, the Defendant fails to make *any* showing of his privacy interest in his parents' or his grandmother's homes. Accordingly, the Court agrees with the Government that the Defendant does not have standing to challenge the searches of 443 and 445 Moody Hill Road, the residences of his grandmother and his parents. With regard to the wooded acreage adjacent to Kevin Trent Bussell's property, the Court likewise does not have much evidence from which it can determine the Defendant's expectation of privacy. Nevertheless, the Master Affidavit describes this parcel as "part of the general family compound in which BUSSELL, LYNN, and GENEVA reside." [Doc. 218, Exh. 3, ¶63] Aerial photographs of the residences contained in Attachment A to the Master Affidavit show all three houses to be accessed by a single driveway and surrounded by woods. Based on this paucity of information, the Court finds that Defendant Kevin Trent Bussell may have a legitimate expectation of privacy in the wooded parcel and will consider it in the probable cause analysis.

undertook any security measures, such as searching the informants before and after the drug purchases. He argues that when the information from the confidential informants and the conclusory statements of the affiant are set aside, the Master Affidavit does not provide probable cause.

The Government responds [Doc. 218] that the affidavit provides ample basis for the issuance of a search warrant for the Defendant's residence because it provides detailed information as to drug activity occurring at the Defendant's residence and describes intercepted telephone conversations in which the Defendant Kevin Trent Bussell discusses the sale of drugs from his residence. Also, the Government points out that Agent Nelson stated in the Master Affidavit that based upon his training and experience, drug traffickers routinely maintain evidence of their drug crimes at their residences. With regard to the Defendant's houseboat, the Government states [Doc. 219] that the Defendant's request should be denied as moot because no evidence was seized in the search of the houseboat.

An affidavit offered in support of a search warrant "must indicate a nexus between the place to be searched and the evidence sought and this nexus may be established by the nature of the items and normal inferences of where a person would keep such items." United States v. Hawkins, 278 F. App'x 629, 634 (6th Cir.), cert. denied 129 S. Ct. 588 (2008); see also United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004). In the present case, the affidavit [Doc. 218, Exh. 3, ¶10.a.] reflects that 439 Moody Hill Road is the Defendant's residence. The most compelling evidence in the affidavit of a nexus between the residence and the sale of oxycodone and other controlled substances are Defendant Kevin Trent Bussell's own statements intercepted from his home telephone. The affidavit [Doc. 218, Exh. 3, ¶48] relates a conversation between Defendant Bussell and a customer on October 23, 2010, in which Bussell discusses the customer's eight

10

previous drug purchases at his residence. In the conversation, Bussell tells the customer to ask for him, the next time the customer comes to Bussell's residence to purchase oxycodone pills. This conversation shows both historical and ongoing drug sales at 439 Moody Hill Road. The affidavit [Doc. 218, Exh. 3, ¶50] also relates a conversation between Bussell and a customer on October 26, 2010, in which they negotiate the price per pill for 400 pills of various controlled substances and Bussell states that he will get the order ready for the customer to pick up at his residence. These allegations in the affidavit establish probable cause to believe that evidence of drug trafficking will be found at Kevin Trent Bussell's residence.

Additionally, probable cause to search 439 Moody Hill Road is supported by information from a confidential informant. The affidavit [Doc. 218, Exh. 3, ¶19] relates that a confidential informant CS-1 "has personally purchased at least 1,000 oxycodone pills from BUSSELL since May 2008, of which the majority of transactions occurred at BUSSELL's residence." CS-1 also reports [Doc. 218, Exh. 3, ¶22] helping Defendant Kevin Trent Bussell count $300,000 in cash from drug sales at Bussell's residence, as well as observing "large quantities of oxycodone pills and cash proceeds from the sale of narcotics" at the residence. These statements provide a direct nexus between Kevin Trent Bussell's Tennessee residence and his drug trafficking activity based upon the personal observations of the confidential informant.

Defendant Kevin Trent Bussell contends that information from CS-1 must be discounted because the affidavit provides no indication that CS-1 is reliable. Under the totality of the circumstances test, the reliability of a confidential informant remains an integral part of the probable cause analysis. See Gates, 462 U.S. at 233 (holding that a confidential informants's reliability and basis of knowledge are "relevant considerations in the totality-of-the-circumstances

11

analysis"); Allen, 211 F.3d at 972-73. An informant's veracity, reliability, and basis of knowledge are not rigid categories. Allen, 211 F.2d at 972-73. The reliability of a confidential source can be demonstrated, at least in part, by prior occasions on which the informant has provided reliable information, see United States v. Ferguson, 252 F. App'x 714, 721 (6th Cir. 2007), but no such occasions are alleged in the Master Affidavit. Additionally, information provided by a confidential informant can be independently corroborated by law enforcement. United States v. Jones, 159 F.3d 969, 974 (6th Cir. 1998). This independent police corroboration must be "substantial." United States v. Fraizier, 423 F.3d 526, 532 (6th Cir. 2005). Police do not necessarily have to corroborate the criminal conduct observed by the informant; instead, corroboration of unincriminating facts can be sufficient to establish probable cause. Gates, 462 U.S. at 243-44. "It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Id. at 244-45 (quoting Jones v. United States, 362 U.S. 257, 269, 271 (1960)).

In the present case, the Master Affidavit provides corroboration of CS-1's information through independent law enforcement investigation. In the Master Affidavit [Doc. 218, Exh. 3, ¶¶19-20 and 25], CS-1 describes Defendant Bussell's trips to Florida with numerous individuals to acquire controlled substances by paying for the individuals to visit various clinics and obtain prescription medication, of which Bussell retained a portion. CS-1, who had accompanied Bussell on several of these trips, stated that Bussell usually takes $60,000 to $100,000 in cash, which he hides in various locations in his vehicle while traveling. The Master Affidavit [Doc. 218, Exh. 3, ¶¶34-38] relates that on November 9, 2010, Tennessee Highway Patrol officers stopped Bussell for speeding while traveling on Interstate 75 South en route to Florida. The affidavit states that officers

12

intercepted telephone calls by Bussell, which alerted them that Bussell was leading a caravan to Florida that day to get drugs. A search of Bussell's truck revealed $35,873 hidden throughout the vehicle, lists of pharmacies in South Florida, business cards of pain clinics and doctor's offices in southern Florida, and a rental agreement for 6081 38th Avenue North, St. Petersburg, Florida. The information observed by police during this traffic stop corroborates the information from CS-1 regarding the trips to Florida.

Intercepted telephone calls also corroborate the information from CS-1. The Master Affidavit [Doc. 218, Exh. 3, ¶69] relates that on November 8, 2010, law enforcement intercepted a telephone call from Bussell, in which he discussed taking "pill shoppers" to Florida to acquire oxycodone. The affidavit [Doc. 218, Exh. 3, ¶¶77-78] also describes two intercepted telephone calls from Bussell on November 10, 2010, in which Bussell describes the traffic stop the previous day, states that the police took some of the cash hidden in his truck, and says that they did not find over $60,000 hidden in the tail lights. This information also corroborates the information provided by CS-1. Additionally, the affidavit [Doc. 218, Exh. 3, ¶24] sets out some of the contents of video and audio recordings taken by CS-1 during a trip to Florida with Bussell in September 2010, which also corroborate CS-1's information. Accordingly, the Court finds that the issuing judge could properly rely on the information from CS-1 to determine probable cause existed to issue the search warrant for Bussell's Tennessee residence because CS-1's information was corroborated by independent law enforcement investigation and by intercepted telephone conversations.

The Defendant also faults the information from CS-1 because the Master Affidavit contains no indication that any security measures, such as searching CS-1, occurred before CS-1 allegedly purchased drugs from him. The Government responds that the purchase of illegal drugs

13

by CS-1 from Defendant Kevin Trent Bussell were not controlled drug buys under the supervision of law enforcement but, instead, were CS-1's purchase of drugs to satisfy his own addiction. Thus, CS-1 could not have been searched prior to the drug transactions, worn a recording device, or used marked money. Accordingly, the corroboration of CS-1's information by police observations and information heard on the intercepted telephone calls is particularly significant.

Finally, the Court observes that the Master Affidavit [Doc. 218, Exh. 3, ¶8] relates that based on his training and experience, Agent Nelson knows that drug dealers keep drugs, drug paraphernalia, and records of drug deals at their residences. The Court of Appeals for the Sixth Circuit has affirmed the propriety of an inference that a drug dealer stores drugs in his own home, even when no drug transactions occurred there. United States v. Williams, 544 F.3d 683, 687 (6th Cir. 2008), cert. denied, 130 S. Ct. 108 (2009); United States v. Miggins, 302 F.3d 384, 393 (6th Cir. 2002) (collecting cases from other circuits); see also United States v. Goward, 188 F. App'x 355, 358 (6th Cir. 2006) (reaffirming the reasoning in Miggins that "it is reasonable to suppose that a drug dealer stores narcotics and equipment used in the distribution of narcotics at his home, even though no drug trafficking was observed to occur there"). While this information from Agent Nelson alone would not necessarily be sufficient to provide probable cause to search 439 Moody Hill Road, it is a factor contributing to the probable cause analysis.

Accordingly, the Court finds that the totality of the circumstances described in the Master Affidavit, including the intercepted telephone calls, the information from CS-1, and Agent Nelson's inference that drug dealers keep controlled substances, proceeds, and records of drug sales at their residences, provided probable cause for the search of Defendant Kevin Trent Bussell's residence at 439 Moody Hill Road.

Defendant Kevin Trent Bussell also argues that the Master Affidavit does not provide probable cause to permit the search of the wooded acreage adjacent to his Tennessee residence. The Master Affidavit [Doc. 218, Exh. 3, ¶¶52-54] relates three telephone conversations intercepted on November 2, 2010, from Kevin Trent Bussell's home telephone. In the first conversation, Bussell tells Trent Mason, who is speaking on the telephone at Bussell's residence, that police have just stopped someone leaving his residence after purchasing drugs and directs Mason "to hide everything in the house[.]" Shortly thereafter, two females at the residence make telephone calls from Bussell's residence and state that Mason was hiding or had hid the narcotics in the woods on the land surrounding Kevin Trent Bussell's home. The Court finds these conversations provide a nexus between the drug trafficking activity at Bussell's residence and the wooded parcel. Thus, the Court finds that the issuing judge had probable cause to issue a search warrant for the wooded parcel.

Finally, Defendant Kevin Trent Bussell argues [Doc. 205] that the Master Affidavit fails to provide a nexus between his houseboat and any criminal activity. The Government responds [Doc. 219] that the Defendant's motion should be denied as moot, because nothing was seized from the houseboat. In support of this contention, the Government has provided a copy of the search warrant return for the November 23, 2010 search of the houseboat, which states that no property was seized. Accordingly, the Court agrees that the Defendant Kevin Trent Bussell's Motion to Suppress No. 2 [Doc. 205] should be denied as moot.

*(2) Defendant Geneva Bussell's Tennessee Residence*.

Defendant Geneva Bussell also contends [Doc. 172] that the Master Affidavit fails to provide probable cause for the search of her residence at 445 Moody Hill Road in Tazewell,

Tennessee. She asserts that the information in the Master Affidavit purporting to link criminal activity to her residence is stale, comes from unreliable and uncorroborated sources, and fails to provide a nexus. The Government responds [Doc. 223] that the information in the Master Affidavit relating to the search of Geneva Bussell's residence is fresh, reliable, and provides a nexus showing that evidence of drug trafficking would be found at 445 Moody Hill Road.

The following portions of the Master Affidavit provide information about the involvement of either Geneva or Leonard Bussell or their residence in the alleged conspiracy:

(1) Paragraphs 22 and 23 relate that CS-1 said that he once purchased oxycodone from Kevin Trent Bussell and was told to leave the payment under the flower pot at Geneva and Leonard Bussell's residence. CS-1 believes that Geneva and Leonard Bussell store money and drugs at their residence for Kevin Trent Bussell.

(2) Paragraph 33 states law enforcement's belief that the intercepted telephone conversations reveal that Kevin Trent Bussell works closely with his parents Geneva and Leonard Bussell to distribute controlled substances and launder the proceeds. The affiant asserts that intercepted calls show that Geneva and Leonard Bussell store pills and tens of thousands of dollars in cash for Kevin Trent Bussell at their residence.

(3) Paragraphs 55 and 56 begin the section entitled "Probable Cause Supporting the Search of 445 Moody Hill Road, Tazewell, Tennessee 37879" and establish that this is the residence of Geneva and Leonard Bussell.

(4) Paragraph 57 states that at approximately 5:19 p.m., on November 5, 2010, Trent Mason called (from Kevin Trent Bussell's home telephone) Kevin Trent Bussell (who answered on Amanda Bible's cellular telephone) and told him that he (Mason) and Jeff Adcock "had counted some money and it came out to $23,002." Kevin Trent Bussell "directed Mason to 'band it up and take it down to mom[.]'" The affidavit further relates that "Mason stated that he would take it to BUSSELL's mom and BUSSELL stated he would call her and see if she could get Mason 'something.'" The affiant then states that based upon his training, experience, and familiarity with this investigation, "'something' is believed to be code for oxycodone

16

pills."

(5) Paragraph 58 states that on November 5, 2010, at around 7:53 p.m., Kevin Trent Bussell called his home telephone from Amanda Bible's cellular telephone and spoke with Trent Mason. Bussell asked to speak with Jeff Adcock and, after confirming with Adcock that no one could hear him, directed Adcock to drive Bussell's truck to meet him. Bussell told Adcock "to stop at 'mom and dad's, she's gonna give you 30 or 40 of them.'" Bussell then told Adcock to make sure that no one knew where he was going. The affiant states that based on his familiarity with his investigation, he believes Bussell told Adcock to go to 445 Moody Hill Road, where Geneva Bussell would give him 30 or 40 oxycodone pills.

(6) Paragraph 59 relates that on November 5, 2010, at approximately 8:05 p.m., Kevin Trent Bussell called his home telephone from Amanda Bible's cellular telephone and spoke with Trent Mason. "Mason asked BUSSELL if he would be able to go to BUSSELL's parents' house and get a 'couple of them until tomorrow.'" Kevin Trent Bussell told Mason that "his dad was asleep and his mom did not want to wake him up, but when he woke up in a little bit, BUSSELL would ask him (LYNN) if he would give Mason a couple." Agent Nelson states that based upon his training, experience, and knowledge of this investigation, "'a couple of them' is code for oxycodone pills."

(7) Paragraph 60 of the Master Affidavit states that on November 7, 2010, at 12:01 p.m., Trent Mason called Leonard Bussell at Leonard Bussell's home telephone number. Mason was returning a call from earlier that day. "LYNN told Mason that he had 'found some of them 30 milligram' (known to be code for 30 milligram oxycodone pills). Mason stated he would be over to see Lynn."

(8) Paragraph 62 relates generally that "as stated above, CS-1 has stated, and wire interceptions have corroborated, that LYNN and GENEVA also store cash proceeds and controlled substances."

(9) Paragraph 64 states generally, "[a]s referenced throughout this affidavit, BUSSELL and his co-conspirators, including his parents, LYNN and GENEVA, are known to conceal controlled substances and large amounts of currency throughout the family compound."

*(i) Staleness*

17

Defendant Geneva Bussell argues that the information contained in the affidavit relating to 445 Moody Hill Road, either contains no reference to time or is stale. She contends that the information from CS-1 (numbers 1 and 8 above) contains no time reference and could have occurred at any time. She states that the only dates linked with the alleged presence of narcotics or proceeds at her residence are November 5-7, 2009 (numbers 4-7 set out above). She argues that given the nature of the items sought–narcotics and related evidence, which are rapidly disseminated or consumed–the affidavit fails to provide probable cause to believe that the contraband or evidence would be at her house nearly two weeks after the seventy-two-hour period related in the affidavit.

The Government responds that the Master Affidavit provides fresh information that the listed evidence would be found at Geneva Bussell's residence. It argues that the information from CS-1 that the Bussell parents stored drugs and money at their residence for their son and that CS-1 had left money to pay for drugs under the flower pot at Geneva Bussell's residence is refreshed by more recent information, i.e., the intercepted telephone calls on November 5 and 7, 2010. The Government also maintains that the passage of eleven days between the last intercepted telephone call on November 7, 2010, and the issuance of the search warrant on November 18, 2010, did not render the information stale because of the ongoing nature of the criminal conspiracy in this case.

Whether information in an affidavit is stale does not depend upon an arbitrary time limitation but is tied to the nature of the crime, the criminal, the location of the search, and the items sought. United States v. Spikes, 158 F.3d 913, 923-24 (6th Cir. 1998), cert. denied, 525 U.S. 1086 (1999).

> [C]ourts must also concern themselves with the following variables: "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring

18

utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), etc."

Id. at 923 (quoting Andresen v. State, 331 A.2d 78, 106 (Md. Ct. Spec. App. 1975)). The length of time from the events in the affidavit to the warrant application is important but not controlling. Id. at 923. "Evidence of ongoing criminal activity will generally defeat a claim of staleness." United States v. Greene, 250 F.3d 471, 481 (6th Cir. 2001).

In the present case, the Court finds that the variables listed in Spikes weigh in favor of finding that the information in the Master Affidavit was not stale. With regard to the character of the crime, while the Defendant is correct that narcotics held for sale are generally only at a given location for a short time, the affidavit details an ongoing conspiracy to procure and sell prescription drugs and to launder the proceeds. In paragraph 19 of the affidavit, CS-1 states that he has purchased at least 1,000 oxycodone pills from Kevin Trent Bussell since May 2008. The affidavit details Kevin Trent Bussell's acquisition of prescription drugs for resale in Michigan and in Florida. The affidavit relates [Doc. 218, Exh. 3, ¶¶34-38] that on November 9, 2010, Kevin Trent Bussell and three coconspirators were stopped by the Tennessee Highway Patrol en route to Florida to obtain drugs. The most recent intercepted call contained in the affidavit is from November 13, 2010 [Doc. 218, Exh. 3, ¶70], when Kevin Trent Bussell, speaking on Amanda Bible's cellular telephone, spoke to "Tonya" about helping her purchase drugs from Jackie Mize in Tennessee, since he (Bussell) was in Florida. Given the ongoing nature of this drug conspiracy, the Court finds it is likely that controlled substances or drug proceeds would still be stored at Geneva Bussell's residence on November 18, 2010. See, e.g., Greene, 250 F.3d 471, 481 (6th Cir. 2001) (holding that a search warrant obtained twenty-three months after the confidential informant's last drug transaction at the

residence was not based on stale information, due to the "continuous and ongoing" nature of the drug trafficking involved).

The evidence contained in the affidavit shows that Geneva and Leonard Bussell were "entrenched," rather than "nomadic." At all relevant times, the affidavit relates them to be living at 445 Moody Hill Road, a location described in the affidavit as being part of "the family compound." The Court also finds that the location to be searched–Geneva and Leonard Bussell's home–was a "secure operational base" indicating that evidence of the drug conspiracy would be at their residence on November 18, 2010. "[W]here the criminal activity occurred in a 'secure operational base,' the passage of time becomes less significant." Greene, 250 F.3d at 481. The criminal activity alleged in paragraphs 57-60, storing drug proceeds and dispensing oxycodone pills, occurred in Geneva Bussell's home, a factor that indicates that evidence of the drug trafficking conspiracy would still be there eleven days later.

The Defendant emphasizes that the nature of the items to be seized (narcotics) reveals the information in the affidavit to be stale. The Sixth Circuit has distinguished drugs from items of enduring value to the criminal, such as child pornography, observing that "drugs are usually sold and consumed in a prompt fashion." United States v. Frechette, 583 F.3d 374, 378 (6th Cir. 2009). Nevertheless, the appellate court acknowledged that, even with regard to controlled substances, evidence of an ongoing and continuing drug trafficking operation mitigates the transient nature of drugs. Id. (citing United States v. Kennedy, 427 F.3d 1136, 1142 (8th Cir. 2005)). Accordingly, although some of the evidence sought in the instant case, such as controlled substances and cash, is easily transferable, the Court finds that the information in the affidavit was not stale due to the permanence of the location and the ongoing nature of the conspiracy.

20

Defendant Geneva Bussell also argues that the information in the affidavit relating to 445 Moody Hill Road is conclusory and unreliable. She contends that Agent Nelson's conclusory statements (paragraphs 33 and 64) that Leonard and Geneva Bussell store drugs and proceeds at their home for Kevin Trent Bussell add nothing to the probable cause evaluation. "The Supreme Court has held that a warrant application must provide sufficient information to allow an issuing judge to independently determine probable cause; his action cannot be a mere ratification of the conclusions of others." United States v. Gunter, 551 F.3d 472, 480 (6th Cir. 2008) (citing Gates, 462 U.S. at 239). Geneva Bussell also characterizes the statement of CS-1 that he or she "believes" that the Bussell parents stored contraband in their house as unreliable. The Government argues that the conclusions of Agent Nelson are supported by facts provided by CS-1 and the intercepted telephone conversations and included in the affidavit.

The Court agrees with the Government that the conclusions by Agent Nelson in paragraphs 33 and 64, that Leonard and Geneva Bussell store controlled substances and the proceeds from drug sales for Kevin Trent Bussell at their home, is supported by other information contained in the affidavit. First, the affidavit [Doc. 218, Exh. 3, ¶23] relates that CS-1 says that he or she "believes" that Kevin Trent Bussell's parents "store money and drugs at their residence for BUSSELL." In this regard, CS-1 states [Doc. 218, Exh. 3, ¶22] that s/he once "purchased a quantity of oxycodone pills from BUSSELL and was directed to pick up the pills from BUSSELL's residence and to leave the cash for the pills under the flower pot of" his parents residence. Thus, CS-1, who as discussed above, in relation to Kevin Trent Bussell's arguments, is both reliable and very knowledgeable about Kevin Trent Bussell's drug trafficking operation, bases his or her belief that

the Bussell parents are involved, at least in part, upon Kevin Trent Bussell directing him to leave a payment for drugs at their house.

Additionally, a series of intercepted telephone conversations from November 5-7, 2010, show that Leonard and Geneva Bussell stored drugs and drug proceeds at their house for Kevin Trent Bussell. In a call at 5:19 p.m., on November 5, 2010 [Doc. 218, Exh. 3, ¶57], Kevin Trent Bussell directs Trent Mason to take $23,002 from his house "'down to mom'" and that Bussell would call his mother and see if she could get "'something'" for Mason. Photographs attached to the Master Affidavit [Doc. 218, Exh. 3, Attachment A] show that Geneva Bussell lived less than 100 feet from Kevin Trent Bussell.[6] Information from CS-1 [Doc. 218, Exh. 3, ¶22] reveals that Kevin Trent Bussell had members of the drug trafficking conspiracy help him count drug proceeds at Kevin Trent Bussell's home. Based upon this information, the reviewing judge could infer that in the intercepted telephone conversation, Kevin Trent Bussell was directing a coconspirator to take drug proceeds to Geneva Bussell at her home.

In addition to Agent Nelson's training, experience and familiarity with the case, which caused him to believe that the "something" referenced in the above intercepted call was oxycodone, a series of three other intercepted telephone conversations show that Geneva and Leonard Bussell also kept controlled substances for Kevin Trent Bussell or, at least, would distribute

_____

[6]At the May 13 hearing, defense counsel for Leonard Bussell argued that this photograph "hurts more than it helps," because the Defendant's grandmother's residence is located between Kevin Trent Bussell's residence and Geneva and Leonard Bussell's residence. Accordingly, counsel asserted that "mom's" could have been either the Bussell parents' residence or the grandmother's residence or "anywhere." The Court finds that the reviewing judge could have readily inferred from the context of the intercepted telephone calls on November 5, 2010, that "mom" which was linked with "dad" was a reference to Kevin Trent Bussell's mother, Geneva Bussell, and her residence, rather than to his grandmother, Wilsie Evans, whom the affidavit [Doc. 218, Exh. 3, ¶61] states lived with Kevin Trent Bussell's uncle.

their own controlled substances at his direction. In a call from Kevin Trent Bussell at 7:53 p.m. on November 5, 2010 [Doc. 218, Exh. 3, ¶58], Bussell directed Jeff Adcock "to stop at 'mom and dad's, she's gonna give you 30 or 40 of them.'" In this call, Kevin Trent Bussell is clearly directing Adcock to go to his parent's residence. Agent Nelson states that based on his familiarity with the investigation, the reference to "30 or 40 of them" is to oxycodone pills.

The affidavit [Doc. 218, Exh. 3, ¶59] relates that nine minutes later, Kevin Trent Bussell receives a telephone call from Trent Mason, who is calling from Bussell's home telephone, asking if he could go to Bussell's parents' house and get a "'couple of them until tomorrow.'" Again, Mason is clearly referencing 445 Moody Hill Road. The affidavit relates that Bussell tells Mason that "his dad is asleep and his mom did not want to wake him up, but when he woke up in a little bit, BUSSELL would ask him (LYNN) if he could give Mason a couple." Agent Nelson again states that based upon his training, experience, and knowledge of the investigation, he believes that "a couple of them" is referring to oxycodone pills. Geneva Bussell contends that Mason would not be asking for oxycodone at 8:02 p.m., if he had actually received "something"–assuming the "something" is oxycodone–from Geneva Bussell when he brought her the cash as directed by Kevin Trent Bussell at 5:19 p.m. Geneva Bussell argues that this indicates that Mason never took the cash to her house. The Court finds that the issuing judge could reasonably infer from Mason's statement that he wanted a "couple of them until tomorrow" that Mason was getting a supply of pills to last him through the night. In any event, Mason's request for additional oxycodone at 8 p.m. precludes neither his delivery of drug proceeds or receipt of oxycodone over two hours earlier.

Finally, the affidavit [Doc. 218, Exh. 3, ¶60] states that around noon on November 7, 2010, a call was intercepted from Kevin Trent Bussell's home telephone to Leonard and Geneva

Bussell's home telephone. In this call, Trent Mason is returning Leonard Bussell's call from earlier that day. Leonard Bussell tells Mason that he had "'found some of them 30 milligram[.]'" Mason says that he will be over to see Leonard Bussell. The issuing judge could reasonably infer from the term "milligram" that Leonard Bussell was talking about drugs. The issuing judge could also reasonably infer from the context of the intercepted conversation that when Mason said he "would be over to see Lynn," he was planning to come to Leonard Bussell's house from which Leonard Bussell was talking to him at that time. Accordingly, the Court finds that these intercepted telephone conversations, overheard by law enforcement and recounted in the Master Affidavit, when considered together, give rise to the reasonable inference that Geneva and Leonard Bussell were storing drugs and drug proceeds at their home for Kevin Trent Bussell.

Geneva Bussell questions the reliability of the participants in these intercepted conversations, Kevin Trent Bussell, Trent Mason, and Jeff Adcock, who are all coconspirators in the alleged crimes. The Court observes that these telephone conversations were surreptitiously recorded, and the affidavit provides no indication that the participants, who were implicating themselves in a drug conspiracy by their statements, were motivated to lie. See Gunter, 551 F.3d at 481. Moreover, the affidavit provides no evidence that Kevin Trent Bussell had a motive to implicate falsely his parents in his drug trafficking. Accordingly, the Court finds that the issuing judge could reasonably infer that the intercepted conversations were reliable.

Although the affidavit does contain some conclusory statements from Agent Nelson, it also contains information from CS-1 and corroboration through intercepted telephone conversations from which the issuing judge could find a substantial basis to conclude that drugs and evidence of drug trafficking would be at Geneva Bussell's residence.

*(iii) Nexus*

Finally, Defendant Geneva Bussell argues that the Master Affidavit, particularly paragraphs 55 through 60 purporting to provide probable cause to support the search of 445 Moody Hill Road, fails to establish a nexus between her home and evidence of drug trafficking. As discussed above with regard to Defendant Kevin Trent Bussell's nexus argument, an affidavit offered in support of a search warrant "must indicate a nexus between the place to be searched and the evidence sought and this nexus may be established by the nature of the items and normal inferences of where a person would keep such items." Hawkins, 278 F. App'x at 634; Carpenter, 360 F.3d at 594. Unlike with regard to Kevin Trent Bussell's residence, the Master Affidavit does not relate that anyone has ever observed drugs in Geneva Bussell's residence. The Government responds that the Master Affidavit gives rise to a reasonable inference that evidence relating to drug trafficking would be found at Geneva Bussell's residence based upon Geneva Bussell's involvement in the oxycodone trafficking conspiracy, intercepted conversations regarding the storage of cash and drugs at Geneva Bussell's home, and information from a reliable confidential informant that Kevin Trent Bussell's parents store drugs and cash for Bussell at their home.

The Defendant contends that paragraphs 55-60 fail to establish that evidence of drug trafficking would be found at 445 Moody Hill Road. First, she states that none of the three conversations on November 5, 2010, involve someone from 445 Moody Hill Road. Instead, they all involve third parties being directed to "mom" or "mom and dad's." She states that nothing substantiates that the coconspirators are being directed to see her at her home or that they actually followed through with the directions from Kevin Trent Bussell and met with her at her house. With regard to paragraph 60, although it involves Leonard Bussell speaking from their home telephone,

25

Geneva Bussell argues the affidavit does not establish that Leonard Bussell could not lawfully possess "some of them 30 milligram" ones in question, that Mason was coming to see him about the pills at his house, or that Leonard Bussell ever actually delivered 30 milligram pills to Mason.

The Defendant likens this case to that in United States v. McPhearson, in which the Sixth Circuit held that information in an affidavit that the defendant was arrested on his front porch pursuant to an arrest warrant for assault and was found to have 6.4 grams of crack cocaine in his pocket is insufficient to provide probable cause for a search warrant to search his house. 469 F.3d 518, 524-25 (6th Cir. 2006). Geneva Bussell argues that nothing in the Master Affidavit shows any more connection between drug activity and her house than the information contained in the affidavit in McPhearson. The Government argues that McPhearson is distinguishable because the appellate court recognized that the affidavit in McPhearson was missing an "additional fact that permitted the magistrate to draw the inference that evidence of wrongdoing would be found in the defendants' homes—namely, the independently corroborated fact that the defendants were known drug dealers at the time the police sought to search their homes." Id. at 524. Instead, the Government relies on a line of Sixth Circuit case law that holds that a judge reviewing a search warrant affidavit may reasonably infer a nexus between drug trafficking and a drug trafficker's home because it is commonly known that "drug traffickers use their homes to store drugs and otherwise further their drug trafficking." United States v. Williams, 544 F.3d 683, 687 (6th Cir. 2008).

"A magistrate may infer a nexus between a suspect and his residence, depending upon 'the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places.'" Id. (quoting United States v. Savoca, 761 F.2d 292, 298 (6th Cir.1985)). As discussed

26

above with regard to the probable cause to search Defendant Kevin Trent Bussell's residence, the

Sixth Circuit as recognized such an inference with regard to drug traffickers in particular, holding

that an issuing judge may reasonably deduce that a drug dealer will keep contraband and evidence

of drug trafficking in his or her home.  Id.; Miggins, 302 F.3d at 393-94.[7]  Thus, an affidavit stating

that a defendant participated in multiple purchases of one to four kilograms of cocaine was sufficient

to support the inference that the defendant would have evidence of drug trafficking at his home:

"Because the quantity of drugs and the repeated nature of the transactions make it reasonable to

conclude that [the defendant] was engaged in ongoing drug trafficking, it was reasonable to infer

that evidence of illegal activity would be found at [the defendant's] residence."  Gunter, 551 F.3d

at 481.  Additionally, an experienced investigator's statement in a supporting affidavit that drug

dealers use their homes to conduct their drug trafficking activities can help establish a nexus

between a suspect's drug crimes and his home.  United States v. Caicedo, 85 F.3d 1184, 1193 (6th

Cir. 1996) (determining that such a statement in an affidavit by an experienced narcotics investigator

---

[7]In Williams, the defendant sought to limit this inference to cases involving drug traffickers.  544 F.3d at 687-88.  The appellate court held that issuing judges may infer that a suspect keeps the "'instrumentalities and fruits'" of a variety of crimes in his home:

> In the present case, the warrant affidavit set forth sufficient facts to permit the issuing judge to infer a link between the handguns sought and Williams's residence.  The warrant application named two informants, Cosme and Jackson, both of whom informed Officer Stewart that Williams possessed two handguns recently used to commit the robbery of marijuana from a drug trafficker.  Several sources substantiated this information, including Detroit Police Department records that indicated police recently arrested Williams for carrying a concealed firearm. Given the evidence that Williams possessed multiple guns, and had recently used them to further his criminal activity, the issuing judge could have reasonably inferred that Williams kept at least one handgun at his residence.

Id. at 588.

established a nexus between the defendant's drug trafficking and his residence, particularly when the investigator knew the defendant was arrested along with a person possessing 565 grams of cocaine and had lied about his address); United States v. Goward, 188 F. App'x 355, 359 (6th Cir. 2006) (affirming nexus when affidavit showed defendant was involved in marijuana trafficking conspiracy, marijuana sales were observed by an undercover officer, the defendant lived at the residence to be searched, and the affiant stated that based upon years of experience and training, he knew drug dealers to keep drugs, paraphernalia, and firearms at their residences) (unpublished).

The Sixth Circuit has cautioned against applying this inference to those not involved in trafficking drugs:

> [T]here is a difference between a drug dealer and a drug user. In most cases, it would be inappropriate for officers who had verifiable evidence of possession of small amounts of drugs for personal use, without further indication of any wrongdoing occurring at that person's residence, to infer a reasonable nexus between that criminal activity and the existence of related criminal activity at the residence.

Id. at 360. Moreover, an officer's training and experience alone is not sufficient to establish a nexus to any location connected to the defendant. United States v. Schultz, 14 F.3d 1093, 1097 (6th Cir. 1994) (finding that officer's training and experience alone did not establish a nexus to the defendant's safe deposit box).

In the present case, the Court finds that the issuing judge could properly infer that controlled substances and proceeds of drug sales would be found at Geneva Bussell's residence. First, Agent Nelson states [Doc. 218, Exh. 3, ¶¶ 3 and 8.a.] that based upon his training and six years of experience with money laundering and narcotics investigations as an IRS criminal investigator, he knows that "[d]rug dealers usually keep controlled substances and paraphernalia for packaging,

28

cutting, weighing, transporting, and distributing controlled substances at places under their control, such as their residences, or in the control of their trusted associates." Evidence of an ongoing and far reaching oxycodone conspiracy is found throughout the affidavit. Additionally, the affidavit contains specific information linking Kevin Trent Bussell's drug trafficking to his parents Geneva and Leonard Bussell and their residence: The statement of CS-1 that s/he had taken a drug payment to 445 Moody Hill Road at Kevin Trent Bussell's direction and that s/he believed that Bussell stored drugs and proceeds at his parent's residence; intercepted telephone calls in which Kevin Trent Bussell directs coconspirators to take cash to or pick up drugs from Geneva Bussell at her residence; and the intercepted call between a coconspirator and Leonard Bussell, speaking from his home telephone, in which Leonard Bussell states that he has 30 milligram pills and the coconspirator states he will come over to see Leonard Bussell later. Based upon this evidence, the issuing judge could reasonably infer that Geneva and Leonard Bussell were engaged in drug trafficking with their son Kevin Trent Bussell and that the evidence of that drug trafficking would be found at their residence, 445 Moody Hill Road.

Based upon the forgoing, the Court finds that the issuing judge had a substantial basis to find probable cause for the search of Geneva Bussell's residence based upon the totality of the circumstances related in the Master Affidavit. Accordingly, the Court recommends that Geneva Bussell's adopted Motion to Suppress [Doc. 172] be denied.

*(3) Kevin Trent Bussell's Florida Residences*

Defendant Kevin Trent Bussell argues [Docs. 206 and 207] that the affidavit by IRS Special Agent Danielle Barto fails to provide probable cause to support the issuance of search

warrants for his two Florida residences, 6065 and 6081 38th Avenue, North, St. Petersburg, Florida. Specifically, he argues that the supporting affidavit fails to show a nexus between his residences and the alleged criminal activity. He also contends that the affidavit fails to show that the confidential informants, who provided information therein, are reliable. He argues that when the information from the confidential informants and the conclusory statements of the affiant are set aside, the affidavit does not provide probable cause to support the issuance of the search warrants.

The Government responds [Doc. 220] that Agent Barto's affidavit provides ample basis for the issuance of the search warrants for the Defendant's Florida residences. It contends that Agent Barto provides detailed information, both from confidential informants and from intercepted telephone conversations, regarding drug activity occurring at the Florida residences. This information is corroborated by law enforcement's independent investigation, specifically a traffic stop and search of the Defendant's vehicle on November 9, 2010, and subsequent surveillance of the Florida residences. Also, the Government contends that Agent Barto's statement in the affidavit that based upon her training and experience, drug traffickers routinely maintain evidence of their drug crimes at their residences, also provides probable cause to issue the search warrants.

*(i) Nexus*

As he did with regard to the search warrant for his Tennessee residence, Defendant Kevin Trent Bussell argues that the Barto Affidavit fails to demonstrate a nexus between his Florida residences and the alleged drug trafficking. The Court finds that the issuing judge could reasonably infer a nexus between 6065 and 6081 38th Avenue, North, and oxycodone trafficking because the affidavit states that (1) controlled substances and large amounts of money were observed at these

two houses, (2) Bussell described trips to Florida to obtain drugs in intercepted telephone conversations, (3) public records link 6065 38th Avenue, North, to members of the alleged drug conspiracy, and (4) Agent Barto states that based upon her training and experience drug traffickers keep evidence of their drug trafficking enterprise in their homes.

First, the Court finds that information from a confidential informant participating in the drug conspiracy reveals a nexus between Kevin Trent Bussell's Florida residences and drug trafficking. CS-1 explained [Doc. 220, Exh. 1, ¶24] that Kevin Trent Bussell would travel to Florida with around thirty people, who would visit doctors and pain clinics to obtain prescription narcotics. CS-1 said [Doc. 220, Exh. 1, ¶¶21 and 24] that Bussell pays for the gas, meals, appointment fees, and prescriptions for everyone, and houses the coconspirators in his two Florida rental properties located next to each other. CS-1 stated [Doc. 220, Exh. 1, ¶25] that s/he has seen "large quantities of oxycodone pills at both of BUSSELL's Florida residences[.]" CS-1 has also observed [Doc. 220, Exh. 1, ¶25] cash proceeds from drug sales at 6065 38th Avenue, North. Additionally, video and audio recordings taken by CS-1 at 6065 38th Avenue, North, on September 11 and 13, 2010, [Doc. 220, Exh. 1, ¶26] show both large amounts of cash and a large quantity of pills at the residence.

Second, intercepted telephone calls, recounted in the affidavit, support the link between the two Florida residences and Kevin Trent Bussell's drug trafficking. In a call on November 8, 2010, Kevin Trent Bussell stated that he took 35 to 40 pill shoppers with him on his trips to Florida but that he was scaling back on future trips because that large number was hard to manage. In two different calls on November 10, 2010, Kevin Trent Bussell said [Doc. 220, Exh. 1, ¶35. b-c] that he was pulled over by police while en route to Florida and that the police seized $35,000 to $40,000 from him but did not find another $60,000 or more dollars hidden in his truck.

31

These telephone conversations reveal that Bussell was engaged obtaining controlled substances during his trips to Florida and that he took a large number of people with him for the purpose of obtaining drugs.

Third, the affidavit shows that law enforcement's investigation independently corroborates the nexus between the Florida residences and the drug conspiracy. The affidavit states [Doc. 220, Exh. 1, ¶28] that a "search of the Florida Department of Motor Vehicles database revealed that twenty-three (23) people currently list 6065 38th Avenue North, St. Petersburg, Florida 33710 as their home address on their Florida I.D. cards." The affiant and other law enforcement officers recognized many names on that list of people as being coconspirators of Bussell. Additionally, the rental the agreement for 6065 38th Avenue, North, provided by CS-2 and the lease for 6081 38th Avenue, North, found in the search of Bussell's truck show four of the coconspirators's names as the lessors [Doc. 220, Exh. 1, ¶¶18 and 23]. On November 8, 2010, officers observing Bussell's Tennessee residence saw a number of people get into Bussell's truck and Nissan Armada, travel through Knoxville, and proceed south on I-75 [Doc. 220, Exh. 1, ¶30]. Just after midnight on November 9, 2010, officers conducted a traffic stop of Bussell's truck [Doc. 220, Exh. 1, ¶31]. During a search of the truck, pursuant to Bussell's consent, officers found over $35,000 hidden throughout the truck, lists of pharmacies in southern Florida, business cards for pain clinics and doctors' offices in southern Florida, and a lease for 6081 38th Avenue, North [Doc. 220, Exh. 1, ¶¶22 and 31]. Officers conducted surveillance in St. Petersburg, Florida, over the next few days and saw Bussell's truck and Nissan Armada parked at 6065 and 6081 38th Avenue, North [Doc. 220, Exh. 1, ¶34].

Finally, the Court finds, as it did with regard to the above analysis of probable cause

32

for the search of Bussell's Tennessee residence and Geneva Bussell's residence, that the affiant's statement that her training and experience show that drug traffickers keep controlled substances, proceeds, and evidence of drug trafficking in their homes permitted the issuing judge to properly infer that evidence of drug trafficking would be found at Bussell's Florida residences as well. See Williams, 544 F.3d at 687 (affirming the inference that a drug dealer stores drugs in his own home, even when no drug transactions occurred there); Miggins, 302 F.3d at 393.

The Defendant argues that the information from the confidential informants cannot be relied upon in the probable cause determination because the affidavit fails to show that they are reliable. As discussed with regard to the Master Affidavit supporting the search of Defendant's Tennessee residence, the Barto Affidavit also does not state that law enforcement had used CS-1 as a confidential informant in the past or that the information s/he provided has led to other search warrants, charges, or convictions. Instead, the Court finds that the affidavit contains substantial independent corroboration of the information provided by CS-1 from the intercepted telephone calls, the information gleaned in the November 9, 2010 traffic stop of Bussell, and the audio and video recordings from September 11-13, 2010. See Jones, 159 F.3d at 974 (holding that information from a confidential informant can be independently corroborated by police); see also Fraizier, 423 F.3d at 532 (observing that independent police corroboration must be "substantial"). Additionally, the information by CS-1 is detailed and of the type that would only be known by an insider in the conspiracy. See Gunter, 551 F.3d at 480 (considering as a factor supporting the informant's reliability that he provided detailed information of ongoing drug sales); United States v. McCraven, 401 F.3d 693, 697 (6th Cir.) (determining that "a detailed description of what the informant observed first-hand" is another "indicia of the informant's reliability"), cert. denied, 546 U.S. 1010

(2005). Accordingly, as above, the Court finds that the affidavit contains information from which the issuing judge could determine that CS-1 was reliable.

Considering the totality of the circumstances related in Agent Barto's affidavit, the Court finds that the affidavit contains probable cause to believe that evidence of drug trafficking would be found at Defendant Kevin Trent Bussell's two Florida residences.

*(4) Nicole Seal's Tennessee Residence*

Defendant Nicole Seal asks [Doc. 195] the Court to suppress all evidence seized during the November 26, 2010 search of her home, 1248 Dogwood Road, Tazewell, Tennessee, because there was not probable cause to issue the search warrant. She argues that the supporting affidavit by Task Force Agent Bayless fails to establish the reliability of two of the three confidential informants, provides stale information from the remaining informant, and recounts an intercepted telephone call, which although more recent does not link any illegal activity to her or her home. The Government responds [Doc. 225] that the affidavit reveals a "proven track record" for at least two of the three confidential informants, making independent police corroboration unnecessary. It also argues that the information in the affidavit from November 23, 2010, refreshed any part of the affidavit that could be considered stale. The Government maintains that the totality of the circumstances provide probable cause to believe that evidence of drug trafficking or money laundering would be found at Seal's residence.

*(i) Information in Bayless Affidavit Relating to Nicole Seal or her Home*

The Court finds the following parts of the Bayless Affidavit are relevant to the search

34

of Nicole Seal's home:

(1) In paragraph 2.l., Agent Bayless states that based upon his training and experience, drug traffickers commonly maintain firearms to protect their property, drugs, and cash stores from theft;

(2) Paragraph 8 relates that CS-1 said s/he went with Kevin Trent Bussell when he hid guns at his sister Nicole Seal's home. CS-1 also stated that Bussell said that he takes guns, specifically an Uzi, to another sister Jessica Wilson. In early November, Bussell told CS-1 that he had $250,000 in cash hidden somewhere.

(3) In paragraph 9, CS-2 states that Kevin Trent Bussell "bragged" to him/her that Bussell had hidden $250,000 and guns at a sister's home. Bussell said he planned to use the money to build a house in Florida;

(4) Paragraph 10 relates that law enforcement executed a search warrant in Florida on November 23, 2010. (Paragraph 7 reveals that this search warrant was executed at one of Kevin Trent Bussell's Florida houses.) At that time, CS-3 told Agent Bayless that Kevin Trent Bussell had between $200,000 and $500,000 in cash hidden at a family member's home and that "'if it was not at the parents['] home it would have to be at one of the sister's home[s]."

(5) Paragraph 12 states that while in jail following the search of his Florida homes, Kevin Trent Bussell spoke with Nicole Seal on a monitored telephone call. Bussell told Seal, "'You know what you have to do don't you, that's all, that's it, there is nothing else[.]" Seal responded that "it is gone[,]" to which Bussell "asks if they got it, referring to the DEA[.]" Seal says no, "that they were afraid[,]" and "that it is gone." Bussell "asks if they can use it and [Seal] replies 'it's on its way somewhere, can't get to it.'" Seal later states that she and Jessica Wilson are flying to Florida to try to get Bussell's child and to make bond for Bussell and his fiancé with $30,000 in cash; and

(6) In paragraph 14, the affidavit states that officers seized under $10,000 in currency in the November 23, 2010 search of Kevin Trent Bussell's parents' home.

35

Defendant Seal contends that this information is insufficient to provide probable cause to search her home because the affidavit fails to show that CS-2 and CS-3 are reliable, the information from CS-1 is stale, and the information from the intercepted telephone call does not link her or her home to anything illegal.

*(ii) Reliability and Basis of Knowledge*

Although she concedes that the affidavit shows that CS-1 is reliable, Defendant Seal argues that the affidavit contains nothing about the reliability of the remaining informants, nor does it establish their basis of knowledge. She asserts that the affidavit merely states that CS-2 overheard Kevin Trent Bussell boasting about hiding money and guns in his sister's house and does not reveal how CS-3 knew about cash Bussell had hidden in a family member's home. The Government argues that the affidavit reveals that CS-3 has a "proven track record" of providing reliable information because it states that the search of Kevin Trent Bussell's home on November 23, 2010 corroborated his information. It maintains that because of this "track record," no independent police corroboration is necessary. The Government also argues that the information provided by the confidential sources corroborates each other.

Defendant Seal does not challenge the reliability of CS-1, and the Court finds that the affidavit provides information showing CS-1 to be reliable,[8] namely the corroboration of his information with video and audio tapes he made inside Bussell's Tennessee and Florida residences, controlled drug purchases from coconspirators, and monitored telephone calls. Also, paragraph 11

---

[8]The Court observes that the information corroborating CS-1 in the Bayless Affidavit is extremely concise, especially when contrasted with the affidavits by Agents Nelson and Barto analyzed above. Nevertheless, the Court finds the corroboration to be minimally sufficient for the issuing judge to make a determination of CS-1's reliability.

states that large amounts of prescription drugs were taken during the November 23, 2010 execution of federal search warrants in Tennessee and Florida. Although paragraph 11 fails to state to whom the properties that were searched belonged, paragraph 7 states that on November 23, 2010, law enforcement searched Kevin Trent Bussell's homes in Florida and Claiborne County, Tennessee. Paragraph 12 states that Kevin Trent Bussell was arrested in Florida after the execution of the search warrants mentioned in paragraph 11. Accordingly, the issuing judge could infer that the search warrants for Bussell's property yielded large amounts of prescription drugs, thereby corroborating CS-1's information by establishing Bussell to be a drug trafficker.

The Court agrees with the Defendant that Agent Bayless's affidavit is devoid of information showing that CS-2 or CS-3 are reliable. With regard to CS-2, the affidavit states [Doc. 196, Exh. 1, ¶7] only the following:

> CS-2 was arrested by 8th JDTF Agents and is currently on probation in the state of Tennessee for drug charges. Much of the information he has provided has been corroborated independently by law enforcement and public record information, along with other information provided by confidential sources.

The affidavit does not describe how the information by CS-2 was independently corroborated by either the police or public records, so the issuing judge had no way to determine whether CS-2 is reliable based upon corroboration. Instead, the issuing judge had only the conclusory statements of the affiant, which do not suffice. See Gunter, 551 F.3d at 480 (holding that the affidavit must permit the issuing judge "'to independently determine probable cause; his action cannot be a mere ratification of the conclusions of others'") (citing Gates, 462 U.S. at 239).

The Court finds the same to be true for CS-3, for which the affidavit states [Doc. 196,

Exh. 1, ¶7] only:

> CS-3 agreed to cooperate and provide information on November 23, 2010 during a search warrant conducted in Florida at one of BUSSELL's homes.  Information provided by CS-3 on that day was corroborated by law enforcement officials in Claiborne County Tn. during a search warrant being conducted at another one of BUSSELL's homes.

The affidavit does not state what information Claiborne County officers seized or discovered during the execution of a search warrant at one of Kevin Trent Bussell's residences.  Thus, the information purporting to establish the track record of CS-3 also fails to permit the issuing judge to assess the reliability of CS-3.

The Government argues that the three confidential informants also corroborate each other.  At the May 13 hearing, AUSA Hui stated that information from CS-2 that Kevin Trent Bussell had boasted to CS-2 that he had $250,000 and guns hidden at a sister's house is corroborated by CS-1's statement that he accompanied Bussell who hid guns at Nicole Seal's house and by CS-3's statement that Bussell had between $200,000 and $500,000 hidden at his parents or one of his sisters' homes.  The statement of CS-1 that s/he witnessed Kevin Trent Bussell hide guns at Defendant Seal's house does provide some limited corroboration of CS-2's statement that Bussell told him that he hid guns at a sister's house.  Likewise, the information from CS-3 supports the amount and location for the hidden money given by CS-2.  Nevertheless, the information from CS-2 shows that s/he unlike CS-1 who saw the guns being hidden at Seal's house, does not have firsthand knowledge of the matter.  The affidavit gives no indication of how CS-3 knows about the hidden money.  Accordingly, the Court finds that the information from CS-2 and CS-3 should not be considered when determining whether probable cause existed to support the issuance of a search

38

warrant for Defendant Seal's home.

*(iii) Staleness*

Even discounting the information from CS-2 and CS-3, the Court finds the affidavit contains a substantial basis for the issuing judge to conclude that evidence of drug trafficking would be found at Defendant Seal's house, because CS-1 states that he witnessed Kevin Trent Bussell hide guns at Nicole Seal's house. The Defendant argues that this information from CS-1 is stale because CS-1 does not say when this occurred, leaving no way for the issuing judge to determine if the evidence would still be present at Seal's residence. The Government argues that the information gained during the November 23, 2010 search and the post-arrest telephone call between Bussell and Seal serve to refresh the information from CS-1.

As discussed above, an assessment of the staleness of information in an affidavit is linked to the nature of the crime, the criminal, the location of the search, and the items sought. Spikes, 158 F.3d at 923-24.

> [C]ourts must also concern themselves with the following variables: "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), etc."

Id. at 923 (quoting Andresen, 331 A.2d at 106). Much of the discussion above with regard to information in the affidavit supporting the search of Geneva Bussell's residence also applies here: This is an ongoing conspiracy; and Defendant Seal was entrenched in her home, which provides a secure operational base. On the other hand, unlike controlled substances, guns have an enduring value to those who possess them. See United States v. Lancaster, No. 04-5826, 2005 WL 1799385,

39

*5 (6th Cir. July 28, 2005) (determining that information from a confidential informant that he saw the defendant fire a machine gun two years earlier was not stale because "firearms are not perishable items"). In this regard, Agent Bayless states in the affidavit [Doc. 196, Exh. 1, ¶2.l.] that drug traffickers keep firearms for protection and will trade drugs for guns and that guns are considered "tools of the trade of drug traffickers." Given the ongoing nature of the drug trafficking conspiracy and the enduring utility of firearms to drug traffickers, the Court finds that the information in the affidavit from CS-1 was not stale.

The Court does not agree with the Government that the information gained in the November 23, 2010 searches and in the subsequent monitored call between Kevin Trent Bussell and Defendant Seal does much to refresh the information from CS-1. Although CS-3 provided information on November 23, 2010, that Bussell had a reserve of cash hidden at his parent's or a sister's home, this does not relate to the guns that CS-1 saw Bussell hide. Moreover, the telephone conversation between Bussell and Seal, while Bussell is detained in Florida only serves, at most, to suggest that Seal may be in control of proceeds from the conspiracy. It also does not relate to the guns allegedly hidden at her house. Nevertheless, the Court finds that the information from CS-1 is not stale because of the nature of the crime (ongoing conspiracy), the criminal (entrenched), the location of the search (residence), and the items sought (firearms of enduring value).

### (iv) Nexus

Finally, in an attempt to distinguish the intercepted telephone call at the jail, Defendant Seal argues that even assuming that the conversation related to contraband, nothing shows that the contraband would be found at her home, particularly when the affidavit states that she said that the items in her possession are now gone. At the May 13 hearing, defense counsel

40

conceded the affidavit establishes a nexus between Defendant Seal's home and evidence of drug trafficking based upon the information from CS-1 that he accompanied Kevin Trent Bussell to hide guns at Seal's residence. The Court finds that Defendant Seal's statements in her telephone conversation with Bussell that "it is gone" and "'it's on its way somewhere, can't get to it" do not negate this nexus. The issuing judge could have inferred that Seal was talking about money rather than a gun or, even if she is talking about a gun, that multiple guns were allegedly hidden at her house.

Based upon the forgoing, the Court finds that the issuing judge had a substantial basis to believe that contraband or evidence of drug trafficking would be found at Nicole Seal's house. CS-1, whose reliability and significant role in the conspiracy is established by the affidavit, states that he has gone with Bussell to hide guns in Seal's house. Additionally, the issuing judge could infer from the monitored jail telephone call between Bussell and Seal that Seal remained involved in the conspiracy because her statements that she was afraid and "it is gone" suggest she has gotten rid of something of interest to law enforcement. Accordingly, even without the information from CS-2 and CS-3, the Court finds that probable cause exists to support the search warrant for Defendant Seal's home. Finally, the conversation between Bussell and Seal reveals that Seal has access to $30,000 cash. This fact, in combination with the information from CS-1 that Bussell said he had $250,000 in cash hidden somewhere permits the issuing judge to reasonably infer that Seal is also storing drug proceeds at her home. Accordingly, the Court recommends that Nicole Seal's Motion to Suppress [Doc. 195] be denied.

*(5) Jessica Wilson's Tennessee Residence*

Defendant Jessica Wilson moves [Doc. 179] the Court to suppress all evidence seized in the November 26, 2010 search of her home.  She contends that the affidavit of Agent Bayless failed to show either that evidence of illegal activity would be found in her home or that probable cause existed to support the issuance of a search warrant.  Defendant Wilson also argues that the affiant made a material omission in the supporting affidavit, and she asks for a evidentiary Franks hearing on this issue.  The Government opposes [Doc. 225] Defendant Wilson's motion, contending that Agent Bayless's affidavit provides probable cause to believe that evidence of drug trafficking and money laundering would be found at Wilson's home.  The Government also asserts that no Franks hearing is warranted in this case because any omission on the part of the affiant is not material to the probable cause finding.  Finally, the Government contends that even if insufficient probable cause existed to support the issuance of the search warrant, the officers relied upon the search warrant in good faith, and the evidence should not be suppressed.

*(i) Information in Bayless Affidavit Relating to Jessica Wilson or her Home*

The Court finds the following parts of the Bayless Affidavit are relevant to the search of Jessica Wilson's home:

> (1) Paragraph 2.c states that based upon his training and experience, Agent Bayless knows that drug traffickers often purchase assets in the names of relatives, "who serve as 'nominee' title holders while the drug traffickers actually own and continue to use the assets and exercise dominion and control over the assets";

> (2) In paragraph 2.l., Agent Bayless states that based upon his training and experience, drug traffickers commonly maintain firearms to protect their property, drugs, and cash stores from theft;

> (3) Paragraph 8 relates that CS-1 said s/he went with Kevin Trent Bussell when he hid guns at his sister Nicole Seal's home.  CS-1 also

42

stated that Bussell said that he takes guns, specifically a "fully automatic Uzi," to another sister Jessica Wilson. In early November, Bussell told CS-1 that he had $250,000 cash hidden somewhere;

(4) In paragraph 9, CS-2 states that Kevin Trent Bussell bragged to him/her that Bussell hid $250,000 and guns at a sister's home; Bussell said he planned to use the money to build a house in Florida;

(5) Paragraph 10 relates that law enforcement executed a search warrant in Florida on November 23, 2010. (Paragraph 7 reveals that this search warrant was executed at one of Kevin Trent Bussell's Florida houses.) At that time, CS-3 told Agent Bayless that Kevin Trent Bussell had between $200,000 and $500,000 in cash hidden at a family member's home and that "'if it was not at the parents['] home it would have to be at one of the sister's home[s]";

(6) In paragraph 11, the affiant relates that while executing search warrants in Tennessee and Florida on November 23, 2010, law enforcement found "the title to a 2010 Yamaha jet ski that was labeled on the envelope 'Trent's jet ski' but the title was in Jessie's name." On this same day, law enforcement seized a houseboat, from which the affiant has personally observed Kevin Trent Bussell selling prescription medication. Bussell told Agent Bayless that the houseboat belonged to Wilson. Workers at the dock told Agent Bayless that they saw Bussell pay for the houseboat with cash;

(7) Paragraph 12 states that while in jail following the search of his Florida homes, Kevin Trent Bussell spoke with Nicole Seal on a monitored telephone call about the search warrants executed on November 23, 2010, and about "the DEA talking to Jessie about getting consent to search her house and laundering money for" him. Seal later states that she and Wilson are flying to Florida to try to get Bussell's child and to make bond for Bussell and his fiancé with $30,000 in cash; and

(8) In paragraph 14, the affidavit states that officers seized under $10,000 in currency in the November 23, 2010 search of Kevin Trent Bussell's parents' home.

Defendant Wilson contends that this information is insufficient to provide probable cause to search

43

her home.

*(ii) Probable Cause and Nexus*

Defendant Wilson argues that the Bayless Affidavit fails to provide reason to believe that criminal activity or evidence would be found at her house at the time of the search. She also maintains that the affidavit is conclusory, uncorroborated, and is a "bare bones" affidavit. The Government argues that the totality of the circumstances in the affidavit meet the low threshold of probable cause.

"An affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a "bare bones" affidavit." United States v. Weaver, 99 F.3d 1372, 1378 (6th Cir. 1996). In the present case, over four and one-half pages of the affidavit are dedicated to Agent Bayless's knowledge of how drug dealers act based upon his training and experience. Paragraphs 4 through 6 (another one and one-half pages) contain Agent Bayless's summary of how Kevin Trent Bussell and his coconspirators obtain and distribute controlled substances based upon "facts" known to law enforcement. Nevertheless, the Court does not find the eleven-page affidavit to be bare bones. The affidavit contains specific facts gained from confidential informants (one of whom is shown to be reliable), from surveillance by the affiant and law enforcement, from the searches of the homes of members of the conspiracy, and from a monitored telephone conversation between Kevin Trent Bussell and Nicole Seal. Accordingly, the Court finds that the supporting affidavit is based on more than Agent Bayless's beliefs or conclusions. This, however, does not automatically mean that the affidavit contains sufficient information to provide probable cause to search Defendant Wilson's home.

44

As discussed above, an affidavit supporting a search warrant must establish a link between the location to be searched and the desired evidence. <u>Carpenter</u>, 360 F.3d at 594. Both the "nature of the items and [the] normal inferences of where a person would keep such items" can help provide the nexus. <u>Hawkins</u>, 278 F. App'x at 634. In the instant case, the only reference to Defendant Wilson's home is in paragraph 8 of the affidavit, in which CS-1 relates that Kevin Trent Bussell has told him/her that "he also takes guns to" his sister Jessica Wilson, "specifically a fully automatic Uzi that BUSSELL told CS-1 he had traded for." "[H]earsay may be the basis for issuance of the warrant 'so long as there * * * (is) a substantial basis for crediting the hearsay." <u>United States v. Ventresca</u>, 380 U.S. 102, 103 (1965) (internal quotation omitted); <u>United States v. Jensen</u>, 432 F.2d 861, 863 (6th Cir. 1970) (observing that "[h]earsay from an unnamed informant may also be admitted when it can be confirmed by independent investigation"). As discussed with regard to Defendant Seal's contentions above, the affidavit contains information showing that CS-1 is reliable. The Court also finds that the affidavit contains a substantial basis to substantiate CS-1's statement that Bussell told him/her that Bussell took an Uzi and other guns to Defendant Wilson.

First, the information that Kevin Trent Bussell hid guns at Defendant Wilson's house was a direct admission by Bussell to CS-1, rather than information from a secondary source. There is no indication that Bussell had any reason to lie about this matter to CS-1, and CS-1 actually observed Bussell engaging in this same activity (hiding guns) at Nicole Seal's house. Although CS-1 did not observe Bussell taking guns to Defendant Wilson's house like s/he did with Defendant Seal, CS-1's statement that he accompanied Kevin Trent Bussell to hide guns at Seal's house and had information that Bussell hid guns at Wilson's house is an admission against CS-1's penal interest. Our Supreme Court has held that the fact that the provision of information is against the

45

informant's penal interest provides a basis for accepting the informant's statement as truthful: "People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their admissions." United States v. Harris, 403 U.S. 573, 583 (1971); United States v. Chafin, 622 F.2d 927, 930 (6th Cir.), cert. denied, 449 U.S. 984 (1980). Certainly, CS-1's statement that Bussell told him/her that Bussell hid guns at Wilson's house is not as harmful to CS-1's own interest as is statement that he went with Bussell when Bussell hid guns at Seal's house, but the information further establishes CS-1's relationship to Bussell and involvement in the drug trafficking conspiracy.

Second, other information in the affidavit relating to Wilson links the drug trafficking and money laundering activity to her, even if it does not link the criminal activity to her home. The affidavit [Doc. 181, ¶11] relates that Wilson's name was on a title to a jet ski purportedly belonging to Kevin Trent Bussell and found in someone else's home [Doc. 181, ¶11].[9] This information links Defendant Wilson to the drug trafficking conspiracy, particularly when considered in light of Agent Bayless's statement that drug traffickers often purchase assets using a relative as a "'nominee' title holder[.]" Third, the affidavit relates [Doc. 181, ¶ 11] that "[w]hen questioned[10] about the house boat [in Union County, Kevin Trent] BUSSELL stated that it belonged to his sister Jessie," but workers at the dock where the houseboat is located told Agent Bayless that they had seen Bussell pay cash for the houseboat. Taking these statements as both true, the circumstances of the

---

[9]The affidavit states that the jet ski title was found during the November 23, 2010 searches in Tennessee and Florida but does not say at whose home it was found. Paragraph 7 states that on November 23, 2010, law enforcement searched Kevin Trent Bussell's homes in Florida and Claiborne County, Tennessee. Accordingly, the issuing judge could reasonably infer that the jet ski title bearing Jessica Wilson's name was found in one of Kevin Trent Bussell's homes.

[10]The affidavit does not say who questioned Bussell about the houseboat, when the conversation occurred, or what the circumstances were.

houseboat's ownership, that the houseboat belonged to Wilson and that Bussell paid cash for it, also links Wilson to the drug trafficking conspiracy.

Finally, the only other information about Wilson related in the affidavit [Doc. 181, ¶12] is in the monitored telephone conversation between Bussell and Seal, in which they discuss the DEA talking to Wilson about consent to search her house and about laundering money for Bussell. The affidavit does not relate the substance , if any, of the conversation between Wilson and the DEA. Seal also states that she and Wilson plan to fly to Florida to get Bussell's child and to provide bond money for Bussell and his fiancé with $30,000 cash. This information shows that Defendant Wilson is willing to help Bussell and other members of the conspiracy and that she has access to $30,000 cash. Considering the totality of the circumstances, the affidavit depicts Defendant Wilson as a passive participant in the conspiracy, who is willing to help her brother Kevin Trent Bussell without necessarily being overtly or actively involved in drug trafficking. This picture of Wilson substantiates CS-1's information that Bussell told him/her that Bussell also took guns to his sister Jessica Wilson. Moreover, the "normal inference" would be that Wilson kept the guns at her house, particularly in light of the information that CS-1 had seen Bussell take guns to Nicole Seal's house. See Hawkins, 278 F. App'x at 634 (holding that the nexus between a location and the evidence sought can be provided by the "nature of the items and [the] normal inferences of where a person would keep such items"). The totality of the information in the affidavit provides a nexus between Defendant Wilson's home and evidence of drug trafficking or money laundering.

Based upon CS-1's information that Kevin Trent Bussell told him/her that he took guns, including an Uzi, to Defendant Wilson and other information in the affidavit linking Wilson to the drug trafficking and money laundering activity, the Court concludes that Agent Bayless's

47

affidavit provides probable cause to issue a search warrant for Defendant Wilson's home. The Court recommends that Defendant Wilson's Motion to Suppress [Doc. 179] be denied.

### (iii) Material Omission

This Court has already found that Agent Bayless's affidavit fails to show that CS-2 is reliable and that the information from CS-2 should not be considered in the probable cause determination. Nevertheless, in the event that the District Court disagrees with this determination, the Court will briefly consider Defendant Wilson's argument that additional information material to CS-2's lack of reliability was omitted from the Bayless Affidavit.

Defendant Wilson contends that Agent Bayless's affidavit contains a material omission because it does not reveal that CS-2 returned to criminal activity after providing information to law enforcement about the drug trafficking conspiracy. She argues that in support of an application for a wiretap, DEA Special Agent Bethel Poston submitted an affidavit (Poston Affidavit) stating that Jeff Adcock was the confidential source identified in the search warrant affidavits as CS-2. The Poston Affidavit states that Adcock was arrested for "doctor shopping" in Florida, after he had served as a confidential informant and that Adcock would no longer be used in the investigation going forward because he had returned to criminal activity.[11] Accordingly, Defendant Wilson asserts that Agent Bayless's failure to disclose in the instant affidavit that CS-2 had returned to criminal activity after becoming a confidential source constitutes a material omission. Thus, she argues that the information from CS-2 must be struck from the affidavit.

_____

[11]Defendant Wilson notes that the Poston Affidavit states that Adcock provided information after his October 30, 2010 arrest that was later corroborated and believed to be reliable.

48

The Government responds that the alleged omission is not material to the assessment of CS-2's credibility. It argues that the affidavit already states that CS-2 had been arrested, was on probation, and was cooperating in order to reduce his own liability in pending drug charges. Thus, the Government states that the issuing judge unquestionably knew that CS-2's veracity could be questioned. Moreover, the Government states that the Poston Affidavit states that Agent Poston had determined that the information from Adcock/CS-2, provided prior to his recent arrest, was reliable despite his recidivism. Accordingly, the Government contends that Defendant Wilson is not entitled to a Franks hearing.

Generally, in determining the sufficiency of the search warrant affidavit, the Court is "concerned only with the statements of fact contained in the affidavit." United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971). In reviewing the propriety of the search warrant, the Court considers "the evidence that the issuing magistrate had before him only 'to ensure that [he] ha[d] a substantial basis . . . for concluding that probable cause existed.'" United States v. Jones, 159 F.3d 969, 973 (6th Cir. 1998) (quoting Illinois v. Gates, 462 U.S. 213, 238-39 (1983)) (alterations in original). In other words, the Court does not look beyond the four corners of the affidavit in assessing whether it provides probable cause.

In Franks v. Delaware, 438 U.S. 154, 155, 164 (1978), the Supreme Court examined whether a defendant ever has the right, pursuant to the Fourth and Fourteenth Amendments, to contest the truthfulness of sworn statements of fact in a search warrant affidavit. Sworn affidavits in support of search warrants are, in the first instance, presumed to be valid. Id. at 171. Nevertheless, a defendant may attack the veracity of factual statements in the affidavit under certain limited circumstances:

49

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

Id. at 155-56; see also United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). If the defendant makes this showing and is granted what has come to be known as a "Franks hearing," he or she must show by a preponderance of the evidence that the affiant intentionally or recklessly included false statements, which are necessary to the probable cause finding, in the affidavit. Franks, 438 U.S. at 156; Bennett, 905 F.2d at 934. If the defendant successfully makes this showing, the evidence gained as a result of the search must be suppressed. Franks, 438 U.S. at 156; Bennett, 905 F.2d at 934.

Material omissions may also merit a Franks hearing in certain circumstances: "Although material omissions are not immune from inquiry under Franks, . . . an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." United States v. Adkins, 107 F.3d 1213, 1217 (6th Cir. 1997). Thus, "except in the very rare case where the defendant makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, Franks is inapplicable to the omission of disputed facts." Mays v. City of Dayton, 134 F.3d 809, 816 (6th Cir.), cert. denied, 524 U.S. 942 (1998). "If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including

50

the omitted portions and determine whether probable cause still exists." <u>Adkins</u>, 107 F.3d at 1217.

In the present case, the Court finds that the Defendant has failed to make the requisite preliminary showing that would permit the Court to delve behind the face of the affidavit. Although the Defendant offers proof of the omitted fact (CS-2's return to criminal activity) in the form of Agent Poston's affidavit, she offers no substantiation of her claim that Agent Bayless either purposely or recklessly omitted this information from the Bayless Affidavit. Moreover, and perhaps more importantly, if this Court were to consider the omission along with the other information in the affidavit, it would find that CS-2's return to criminal activity has no bearing upon the probable cause analysis. Agent Bayless's affidavit already states [Doc. 181, ¶7] that "CS-2 was arrested by 8th JDTF Agents and is currently on probation in the state of Tennessee for drug charges. CS-2 has agreed to cooperate in the hopes of reducing his liability for these pending state drug charges." Accordingly, the affidavit already informs the issuing judge that CS-2 is part of the criminal milieu, faces drug charges, and is providing information in order to help himself. The Court finds that the omission was not material to the probable cause finding. Therefore, a <u>Franks</u> hearing is not warranted in this case.

### (iv) Good Faith

In the event that the District Court disagrees with this Court's finding that Agent Bayless's affidavit provides probable cause to search Defendant Jessica Wilson's residence, the Court will consider the Government's alternative argument[12] that the good faith exception to the

---

[12]The Court notes that the Government makes this alternative argument in responding to each of the suppression motions analyzed herein. Because this Court perceives the search warrant for Defendant Wilson's residence to present the closest call with regard to the probable cause finding, the Court addresses the good faith exception at this point in the analysis. The

exclusionary rule bars suppression in this case. The Government argues that even if this Court

determines that Agent Bayless's affidavit lacks a substantial basis for the issuing judge to find

probable cause to search Defendant Wilson's house, suppression of the evidence seized from

Wilson's home is not warranted because the officers reasonably relied on the search warrant in good

faith. The Government contends that Agent Bayless provided a detailed affidavit, giving

information by reliable confidential informants who were corroborated by recent monitored

telephone calls and the recent execution of search warrants. Thus, the Government asserts that a

reasonably well-trained officer would have relied on the search warrant issued based upon Agent

Bayless's affidavit. Relying upon United States v. Herring, 129 S. Ct. 695 (2009), the Government

contends that the executing officers acted in good faith and their actions do not warrant the high

societal cost of applying the exclusionary rule.

　　　　At the May 13 hearing, defense counsel[13] argued that the good faith exception to the

exclusionary rule does not apply because the search warrant affidavit is so lacking in probable cause

that it was unreasonable for Agent Bayless to believe that probable cause existed. Counsel also

argued that the affiant knowingly misled the issuing judge by omitting the fact that CS-2 was no

longer being used as a confidential source in the investigation. Counsel characterizes this omission

as purposeful because paragraph 7 of the Bayless Affidavit is identical to a portion of Agent

Poston's affidavit supporting the wiretap application, with the exception of the omission of the

---

following analysis would apply equally to the searches of Defendant Kevin Trent Bussell's
Tennessee and Florida residences, Defendant Geneva Bussell's residence, and Defendant Nicole
Seal's residence, should the District Court determine that probable cause was lacking to issue
any of those search warrants.

　　　　[13]This argument was made by counsel for Defendant Seal and adopted by counsel for
Defendant Wilson.

information about CS-2's re-arrest. Accordingly, the Defendant concludes that the information about CS-2's re-arrest was deliberately removed so that the reviewing judge would view the information provided by CS-2 more favorably. The Defendant argues that the exclusionary rule must be applied to suppress all evidence seized from Defendant Wilson's residence.

"The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000); see also Mapp v. Ohio, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); Weeks v. United States, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment). However, the exclusionary rule is not applied automatically upon a finding of a Fourth Amendment violation. See Herring, 129 S. Ct. at 700. Exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Id. at 699 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," Arizona v. Evans, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" Herring, 129 S. Ct. at 700 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)). "'[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.'" Herring, 129 S. Ct. at 700 (quoting Illinois v. Krull, 480 U.S. 352-53 (1987)). In the end, the decision to suppress evidence "turns on the culpability of the police and the potential for exclusion to deter wrongful police conduct." Id. at 698.

In the present case, the Government contends that Agent Bayless and the executing

53

officers acted in good-faith reliance on the search warrant for Defendant Wilson's home issued by Judge Estep. In United States v. Leon, the Supreme Court recognized that the deterrent effect of the judicially created exclusionary rule did not extend to situations in which an officer in objective good faith obtains a search warrant from a judge and acts within the scope of that warrant. 468 U.S. 897, 920 (1984). "In the ordinary case, an officer cannot be expected to question the [judge's] probable-cause determination or his judgment that the form of a warrant is technically sufficient. . . . . Penalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. at 921.

The fact that a judge has issued a warrant typically will establish that the officer has conducted the search pursuant to said warrant in good faith, but the officer's reliance upon the warrant must be objectively reasonable. Id. at 922. In other words, the good-faith inquiry turns upon "whether a reasonably well-trained officer would have known that the search was illegal despite the [judge's] authorization." Id. at 922 n.23. In creating this standard, the Supreme Court set out four situations in which suppression pursuant to the exclusionary rule applies despite the officer's reliance upon a judicially-issued search warrant: (1) "if the . . . judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," (2) if the issuing judge "wholly abandoned his judicial role" requiring neutral detachment and, in essence, acted as "'an adjunct law enforcement officer,'" (3) if the "warrant [was] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and (4) if "the warrant [is] so facially deficient–i.e., in failing to particularize the place to be searched or the things to be seized–that the executing officers cannot reasonably presume it to be valid." Id. at 923 (quoting Lo-

54

Ji Sales, Inc. v. New York, 442 U.S. 319, 326-27 (1979) and Brown v. Illinois, 422 U.S. 590, 610-11 (1975) respectively). The Defendant relies on the first and third of these "exceptions" to the good faith exception.

First, the Defendant argues that Agent Bayless deliberately mislead the issuing judge by failing to include in the search warrant affidavit the fact that CS-2 had returned to criminal activity after agreeing to work as a confidential informant and had been arrested for his renewed criminal conduct. In support of this contention, the Defendant argues that paragraph 7 of the Bayless Affidavit is identical to a portion of Agent Poston's affidavit supporting the wiretap application, except for the admission of the information about CS-2's arrest.[14] The Court finds that

---

[14]The Court finds that examination of the actual language in the affidavits does not necessarily support the Defendant's contention. The Defendant provides no citation to the portion of the affidavit supporting the wiretap application to which she refers. First, the Court notes that there are two affidavits by Agent Bethel Poston supporting separate applications for wiretaps. The first affidavit was filed on October 20, 2010, in support of the application to tap Kevin Trent Bussell's home telephone. It states as follows, with regard to CS-2's criminal history:

> CS-2 was arrested by 8th JDTF Agents and is currently charged with state drug offenses. CS-2 has agreed to cooperate in the hopes of reducing his liability for these pending state drug charges. Much of the information he has provided has been corroborated independently by law enforcement and public record information, along with other information provided by other confidential sources. CS-2 has agreed to testify.

[Doc. 327, Oct. 20, 2010 affidavit, ¶12.b.] Agent Poston filed a second affidavit on November 5, 2010, in support of an application to tap a cellular telephone to which Kevin Trent Bussell subscribed. The portion of Agent Poston's November 5, 2010 affidavit relevant to CS-2's criminal history states:

> CS-2 was arrested by 8th JDTF Agents and is currently charged with state drug offenses. *CS-2 was later arrested by the Tampa, Florida Poolice [sic.] Department and is currently charged with Florida state drug offenses.* CS-2 has agreed to cooperate in the

55

the omission of the information on CS-2's re-arrest, even if deliberate, was not necessarily done with the intent to mislead the judge reviewing the search warrant. Agent Poston states in his November 5, 2010 affidavit supporting the wiretap application that information provided by CS-2 after his re-arrest was later corroborated and believed to be reliable.[15] Thus, the Court finds that it would have

> hopes of reducing his liability for these pending state drug charges. Much of the information he has provided has been corroborated independently by law enforcement and public record information, along with other information provided by other confidential sources. CS-2 has agreed to testify.

[Doc. 327, Nov. 5, 2010 affidavit, ¶12.b. (italics added)] In contrast, the pertinent part of paragraph 7 of Agent Bayless's affidavit, which was signed on November 26, 2010, states:

> CS-2 was arrested by 8th JDTF Agents and is currently *on probation in the state of Tennessee for drug charges.* CS-2 has agreed to cooperate in the hopes of reducing his liability for pending state drug charges. Much of the information he has provided has been corroborated independently by law enforcement and public record information, along with other information provided by other confidential sources.

[Doc. 181, ¶7] Thus, the Court finds that paragraph 7 differs in more than just the deletion of the Tampa arrest. Nevertheless, the Court will address the spirit of the Defendant's argument, that Agent Bayless omitted the information on the Tampa arrest in order to mislead the issuing judge.

[15]Agent Poston includes the following footnote in his November 5, 2010 affidavit:

> ADCOCK is the same person as "CS-2" referenced throughout this affidavit and the exhibit affidavit attached hereto. As noted in paragraph 43, on October 20, 2010, after previously having provided truthful and reliable information to law enforcement (which was used in the exhibit affidavit attached hereto), ADCOCK was arrested in Tampa, Florida. ADCOCK again provided information to law enforcement which has been independently corroborated and found to be reliable. Given his reentry into the organization, however, CS-2 will not be used in the future. Furthermore, although all information he has provided has proved to be reliable, as independently corroborated by law enforcement, he has not been used proactively in this investigation

56

been objectively reasonable for Agent Bayless to conclude the information on the re-arrest was unnecessary (1) because the affidavit already included information on CS-2's criminal activity and desire to help himself by providing information and (2) because all the information that CS-2 had provided was reliable, despite his re-arrest and the DEA's decision to no longer use him as a confidential informant. Accordingly, the Court finds the information before it does not support a finding that Agent Bayless purposely attempted to mislead the issuing judge.

Second, the Defendant contends that the affidavit supporting the search warrant for Defendant Wilson's home was so lacking in probable cause that Agent Bayless could not have reasonably relied upon it. The Supreme Court recognized in <u>Leon</u> that "no reasonably well trained officer . . . . would . . . manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" 468 U.S. at 923 (quoting <u>Brown v. Illinois</u>, 422 U.S. 590, 610–611 (1975) (Powell, J., concurring in part)). In <u>Carpenter</u>, the Sixth Circuit examined this standard in the context of a search warrant affidavit that failed to establish a nexus between the place to be searched and the evidence sought. 360 F.3d at 596. First, the appellate court cautioned against blurring the reasonable basis standard required under the good faith exception and the substantial basis standard required for finding probable cause. <u>Id.</u> Instead, an affidavit containing "a minimally sufficient nexus between the illegal activity and the place to be searched," as compared to an affidavit containing no nexus whatsoever, justifies an officer's reliance on the warrant, even if the information falls short of establishing probable cause. <u>Id.</u> Thus, in <u>Carpenter</u>, the court determined

_____

(i.e., to conduct controlled purchases).

[Doc. 327, Nov. 5, 2010 affidavit, ¶7 n.1]

that the affidavit's vague connection between the marijuana field observed by the police and the house they sought to search (that the marijuana was growing "near" the house and that a road connected the house and the marijuana plants), while insufficient to establish probable cause, was "not so vague as to be conclusory or meaningless." Id.

As pointed out by the Government, Agent Bayless's affidavit is not "bare bones" or conclusory. Instead, the eleven-page affidavit contains information from three confidential informants, information gleaned from police surveillance, information gained during the search of other locations linked to the drug trafficking conspiracy, and information from a monitored telephone conversation. The Government also argues that Agent Bayless's reliance on the search warrant was reasonable in light of the Sixth Circuit case law permitting the inference of a nexus between a drug trafficker's residence and the evidence of drug trafficking. The Government cites the Court to United States v. Higgins, in which the majority found that the search warrant was not based upon probable cause because the informant was not shown to be reliable. 557 F.3d 381, 390-91 (6th Cir. 2009). Nevertheless, the court found that the good faith exception served to bar the application of the exclusionary rule:

> In this case, the police had received information from a named informant who, in the course of admitting that he had committed a crime, told police that he had purchased drugs from Higgins's address earlier that day. As discussed above, the police had not worked with the informant before and did not know whether drugs had been sold or seen inside Higgins's residence, but a magistrate did issue a warrant based on the facts included in the affidavit. This circuit's holdings indicate that a nexus between the place to be searched and the item to be seized may sometimes be inferred. See United States v. Williams, 544 F.3d 683 (6th Cir. 2008). Here the warrant contained a sufficient link between Higgins's home and drug activity such that a reasonably well-trained officer would not have known that the search was illegal. See Carpenter, 360 F.3d at 596. Accordingly,

58

we conclude that exclusion is inappropriate and the evidence stemming from the search should not be suppressed.

Id. at 391.

In the instant case, the Court finds that like the affidavit in Carpenter, Agent Bayless's affidavit does contain a minimal link between the evidence of drug trafficking sought and Defendant Wilson's residence, i.e., CS-1's statement that Kevin Trent Bussell told him that he had taken guns, specifically an Uzi, to Defendant Wilson. This in connection with CS-1's statement that he accompanied Bussell when he also hid guns at his other sister Nicole Seal's house, serves to relate the hiding of firearms to Defendant Wilson's home. This information provides an objectively reasonable basis for Agent Bayless to believe that the search warrant based thereon was valid. In discerning this minimal link, the Court does not, however, rely on an inference that drug traffickers keep evidence of their crimes in their homes because, unlike in the Higgins case cited by the Government, none of the confidential informants in this case personally linked Defendant Wilson to drug trafficking.

In so finding, the Court is guided by the Supreme Court's cautionary instructions to courts in the position of reviewing search warrants for probable cause:

> [T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

59

Ventresca, 380 U.S. at 108.  Moreover, the recent case of Herring provides that to "trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. at 702.  In other words, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Id. The Court finds no evidence that Agent Bayless was acting recklessly or with gross negligence in bringing the instant affidavit or in relying upon the search warrant issued therefrom.  Moreover, the Court finds that a reasonably well-trained officer who presents an affidavit containing information from confidential informants, police surveillance, monitored telephone conversations, and the execution of other search warrants to a reviewing judge would be objectively justified in relying on the judge's probable cause determination.  Accordingly, the Court finds that the exclusionary rule should not be applied to suppress the evidence seized from Defendant Wilson's home.

## B.  Particularity

Defendants Kevin Trent Bussell and Geneva Bussell argue [Docs. 204, 206, and 207],[16] that the search warrants for Kevin Trent Bussell's Tennessee and Florida residences and the search warrant for Geneva Bussell's Tennessee residence fail to particularize the items to be seized thereby giving the executing officers unlimited discretion.  They contend that because Attachment G to the search warrants permitted the officers to seize virtually everything in their homes, the

---

[16]Defendant Kevin Trent Bussell also faults [Doc. 205] the particularity in the search warrant authorizing the search of his houseboat, but the Government responds [Doc. 219] that nothing was seized from the houseboat.  Accordingly, the Court agrees with the Government that this motion should be denied as moot.

search warrants were, in fact, invalid general warrants. Accordingly, they argue that all of the evidence seized from their Tennessee and Florida residences must be suppressed. The Government responds [Docs. 218 and 220] that the lists of items to be seized from the various residences were as particular as the circumstances and nature of the drug trafficking and money laundering crimes under investigation permitted and that the basis for seeking each category of property was supported in the affidavits. Additionally, it argues that if the Court finds some portions of the search warrants to be overly broad, then the remedy is suppression of any evidence seized pursuant to those portions of the warrants, not the suppression of all evidence seized during the searches.

The Fourth Amendment requires that "[n]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. am. IV. The particularity requirement forecloses the opportunity for a general search and "prevents the seizure of one thing under a warrant describing another" by restricting the discretion of the executing officer. Marron v. U.S., 275 U.S. 192, 196 (1927). "'A general order to explore and rummage through a person's belongings is not permitted. The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized.'" United States v. Savoy, 280 F. App'x 504, 510 (6th Cir.) (quoting United States v. Cook, 657 F.2d 730, 733 (5th Cir. 1981)), cert. denied, 129 S. Ct. 742 (2008). "The particularity requirement eliminates the 'danger of unlimited discretion in the executing officer's determination of what is subject to seizure.'" Id. (quoting United States v. Savoca, 761 F.2d 292, 298-99 (6th Cir. 1985)). "[T]he degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." United States v. Henson, 848 F.2d 1374, 1383 (6th Cir. 1988). The description of items to be seized pursuant to a search warrant is sufficient "'if

61

it is as specific as the circumstances and the nature of the activity under investigation permit.'" Id. (quoting United States v. Blum, 753 F.2d 999, 1001 (11th Cir. 1985)).

In the instant case, the search warrants for Kevin Trent Bussell's [Doc. 204, Exh. 1] and Geneva Bussell's[17] Tennessee residences lists the property to be seized as contained in "Attachment G which is attached hereto and incorporated herein." Attachment G states "[t]he records to be seized include the following items for the time period December 31, 2006, through the present:" and lists twenty-one categories of items. The Defendants argue that Attachment G is comprised of boilerplate language, essentially permitting the executing officers to seize anything and everything from their homes. Relying on a Tenth Circuit case, they contend that when officers seize property in gross excess of that permitted by the search warrant, the warrant becomes a general warrant and all the evidence seized pursuant to that warrant must be suppressed. See United States v. Medlin, 842 F.2d 1194, 1199 (10th Cir. 1988). They specifically challenge the following categories from Attachment G as being overly broad:

> e. Travel related documents including itineraries, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, airline receipts, bus tickets, vehicle rental receipts, credit card receipts, travel schedules, diaries, day planners, hotel receipts, logs, travel agency vouchers, and notes;
>
> h. United States and/or foreign currency, automobiles, boats, recreational vehicles, other vehicles, home furnishings, safes, stocks, bonds, financial instruments and investments, precious metals and gemstones, jewelry, electronic equipment and other assets which may constitute the proceeds of the sale of narcotics;

---

[17]Although Geneva Bussell did not file a copy of the search warrant authorizing the search of her home in the record, the Court has checked the original warrant that it has on file [3:10-MJ-2153] and notes that Attachment G is identical to that in the search warrant for Kevin Trent Bussell's Tennessee residence.

o.  Electronic equipment and their contents, containing information related to the transportation, ordering, purchasing, processing, storage and distribution of controlled substances, and the proceeds there from, including pagers (digital display beepers), telephone answering machines, electronic data organizers, telephone caller identification boxes, video and audiocassette tapes, CD's, DVD's and any stored electronic communications contained therein;

q.  Photographs of all adults, vehicles, real estate, jewelry, currency, furs, boats, and/or substances having the appearance of narcotics, including still photos, negatives, videotapes, CD's, films, slides, undeveloped film and the contents therein;

u.  Computer system hardware, including, but not limited to word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, and other computer related devices, and software, including floppy disks and any other medium which is capable of storing magnetic tape or optical coding, software programs, and any other programs, or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission, computer manuals relating to the operation of a computer system, computer software, and/or any related device relating to but not limited to the purchase, transportation, ordering, sale and distribution of illegal controlled substances and/or records, relating to the receipt and disposition of the proceeds from the distribution of illegal controlled substances.

The search warrants for Kevin Trent Bussell's Florida residences [Docs. 206, Exh. 1, and 207, Exh. 1] list the items to be seized as follows: "Please see attachment B which is attached hereto and incorporated herein."  Attachment B states "[t]he records to be seized include the following items for the time period December 31, 2006, through the present:" and lists the same twenty-one categories of items as listed in Attachment G to the Tennessee search warrants.  In the Florida search warrants, the issuing Magistrate Judge Anthoney E. Porcelli scratched out categories "k.  All business records;" as well as o. and u. set out above.  Judge Porcelli also crossed out

63

portions of categories h. and j., so that they read as follows:

> h. United States and/or foreign currency. ~~automobiles, boats, recreational vehicles, other vehicles, home furnishings, safes, stocks, bonds, financial instruments and investments, precious metals and gemstones, jewelry, electronic equipment and other assets which may constitute the proceeds of the sale of narcotics;~~

> j. ~~All financial statements, accounting records,~~ [Any] receipts, and invoices.

Defendant Kevin Trent Bussell argues that these alterations show that Attachment G was overly broad. Despite these alterations, he also argues that the search warrants for his Florida residences are not sufficiently particular. Presumably, he challenges categories e. and q. in Attachment B to the Florida search warrants, which are identical to those same sections of Attachment G to the Tennessee search warrants.

Accordingly, the Court will examine the particularity of the five categories challenged by the Defendants.

*(1) Notes*

The Defendants argue that the term "notes" in category e. in the attachments to both the Tennessee and Florida search warrants is overly broad and essentially permits the seizure of anything written in the residences. The Government responds that the Defendants' misconstrue the breadth of the term "notes." It argues that the words in each of the categories must be read in relation to the other words in that category. Thus, the Government contends that "notes" means only those notes related to travel, as is evident by reading the term in the context of the entire category. The Government asserts that the Master Affidavit supports the seizure of documents and notes

relating to the Defendants' travel because the modus operendi of the conspiracy was for the coconspirators to travel outside of Tennessee to acquire prescription drugs that would be sold upon their return.

The Court agrees with the Government that category e. and the term "notes" contained therein is sufficiently particular. "[N]otes" must be read in conjunction with "[t]ravel related documents including," which is followed by a list of documents, like "notes," that constitute travel-related documents. The Court also observes that the term "notes" and all of category e. is further restricted by the date limitation that heads both attachments, which restricts all materials that may be seized to those "for the time period December 31, 2006, through the present[.]" Additionally, the Court agrees that the Master Affidavit and the Barto Affidavits provide a basis for the seizure of travel-related documents because the affidavits relate how the members of the conspiracy traveled to Michigan, Georgia, and particularly Florida to obtain prescription medication that they would then transport back to Tennessee to sell. Accordingly, the Court finds that category e. in Attachments B and G is not overly broad.

*(2) Drug Proceeds*

The Defendants argue that the search warrant permitted the executing officers to exercise unfettered discretion as to what constituted "assets which may constitute the proceeds of the sales of narcotics" in category h. The Defendants cite to <u>United States v. Popham</u>, in which the Eastern District of Michigan assessed the particularity of a search warrant authorizing the seizure of "'items of value being proceeds of or used to facilitate trafficking controlled substances'":

> When viewed against the background of the affidavit, the most that can be established in this case is that the affiant learned from other cases that sometimes drug manufacturers have valuable things near

65

their place of operations, and occasionally those valuables were acquired with the proceeds of drug sales. In this case, there is no information that such valuable things actually would be found on the premises, or that any sale of contraband occurred on the premises or by the defendants. The premises also was used mainly as a dwelling, where one might expect a person to keep his possessions, ill-gotten or not, so the link between property and illegal activity was tenuous without more information. There was no basis outlined in the warrant for distinguishing between valuable items that were drug proceeds and those that were not. The challenged provision in the search warrant, therefore, amounted to an authorization to the police to seize everything of value found on the property, which is exactly what they did.

382 F. Supp. 2d 942, 955 (E.D. Mich. 2005), aff'd 250 F. App'x 170 (6th Cir. 2007). The Defendants argue that, like in Popham, the instant search warrant gives no guidance to the executing officers as to how to determine whether an item in the residences constituted an asset gained through drug proceeds. The Defendants argue that the fact that Judge Porcelli struck this language from the Florida search warrants indicates that the language is overly broad. They contend that essentially this portion of the search warrants permitted the executing officers to seize everything in their Tennessee residences.

At the May 13 hearing, the Government argued that the search warrant affidavit supports category h. of Attachment G, permitting the seizure of any items of value in the home as derived from drug proceeds because the Master Affidavit shows that Kevin Trent Bussell had no legitimate income. Thus, it contended that everything in the Defendants' homes could be seized as drug proceeds or assets derived therefrom. Alternatively, it argues that if this portion of Attachment G is overly broad, then the remedy is for the Court to suppress only those items that the Court finds were seized pursuant to this language, not everything seized pursuant to the search warrants for the Tennessee residences.

66

Category h. permits the seizure of "United States and/or foreign currency, automobiles, boats, recreational vehicles, other vehicles, home furnishings, safes, stocks, bonds, financial instruments and investments, precious metals and gemstones, jewelry, electronic equipment and other assets which may constitute the proceeds of the sale of narcotics." The Court finds that the Master Affidavit provides a basis for seizing some of the items listed in category h. as drug proceeds. First, the affidavit is replete with evidence showing that currency found in Kevin Trent Bussell and Geneva Bussell's homes constituted drug proceeds. CS-1 stated [Doc. 218, Exh. 3, ¶22] that he has helped Bussell count $300,000 in cash from drug sales at Bussell's Tennessee residence. Additionally, an intercepted telephone call from Bussell's Tennessee residence on November 5, 2010 [Doc. 218, Exh. 3, ¶57] , shows that coconspirators had counted out $23,002 at Bussell's residence. Other portions of the affidavit [Doc. 218, Exh. 3, ¶¶22 (Kevin Trent Bussell tells CS-1 to leave the cash from his pill purchase under the flower pot at Geneva Bussell's residence) and 57 (Kevin Trent Bussell tells Trent Mason to take $23,002 to "mom")] show currency from drug sales being taken to Geneva Bussell's residence.

Second, the Master Affidavit also supports the seizure of "automobiles, boats, recreational vehicles, other vehicles" as either drug proceeds or the instrumentalities of the crimes. Paragraph 58 relates an intercepted telephone call in which Kevin Trent Bussell directs Jeff Adcock to take Bussell's truck to retrieve and deliver pills. Police surveillance [Doc. 218, Exh. 3, ¶¶34-38 and 79-81] shows Bussell using his Ford F250 pickup truck and his Nissan Armada to transport coconspirators to Florida to obtain prescription drugs. Paragraphs 65-66 detail police surveillance of suspected drug sales from Bussell's houseboat and using his jet skis.

Third, the Court finds that the affidavit also supports the seizure of safes as

instrumentalities for storing drugs and drug proceeds. CS-1 made a video recording [Doc. 218, Exh. 3, ¶24.b.] of an open safe in Kevin Trent Bussell's Florida home containing pills and cash. It is reasonable to infer that if Bussell had a safe in his Tennessee residence, he also might store drugs and proceeds in it.

The affidavit, however, does not provide much support for the seizure of "home furnishings, . . ., stocks, bonds, financial instruments and investments, precious metals and gemstones, jewelry, electronic equipment and other assets which may constitute the proceeds of the sale of narcotics." Only the statements of Agent Nelson [Doc. 218, Exh. 3, ¶8.c. and f.] that based upon his training and experience,

> [d]rug traffickers commonly profit and amass proceeds from the sale of drugs. In order to protect their illegal activity and be able to utilize their drug profits, they attempt to disguise and legitimatize these profits through money laundering activities.
>
> . . .
>
> Drug traffickers maintain records pertaining to their acquisition, conversion, movement, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments and investments, real estate, automobiles, boats, other vehicles, home furnishings, stocks, bonds, precious metals and gemstones, jewelry, electronic equipment and other assets in the form of books, records, invoices, receipts, records of real estate transactions, purchase agreements, automobile titles, bank statements, financial statements, letters of credit, money orders, cashier's checks, safe deposit box agreements and keys, and money wrappers[,]"

suggest that the remaining items listed in category h. would be evidence of drug trafficking proceeds in this case.

The Government correctly points out that the Master Affidavit [ Doc. 218, Exh, 3, ¶¶39-46] suggests that, based on bank records obtained by grand jury subpoena, Kevin Trent Bussell

68

did not have a legitimate source of income consistent with his display of wealth from late summer 2008 through November 2010. Nevertheless, the Court does not conclude from this that the officers could have seized all of his possessions as gained through drug proceeds, particularly when it notes [Doc. 218, Exh. 3, ¶43], that the bank records reveal that the Defendant's checking account showed the typical deposits and withdrawals for a trucking business from January 2006 through July 2008. Accordingly, the Court finds that jewelry or home furnishings or other possessions could have been purchased by Bussell prior to July 2008 and that the search warrant provides no way for the executing officers to distinguish those assets that constitute drug proceeds. The Government cites the Court to United States v. Greene, 250 F.3d 471, 477(6th Cir. 2001). In Greene, the parties agreed that a "catch all" clause in the search warrant permitting the seizure of "'any other property that which (sic) is not identified as the occupant's personal property,'" following a detailed list of stolen items, was overly broad and gave the officers excessive discretion in determining what to seize. Id. The Court finds that the list of "home furnishings, . . ., stocks, bonds, financial instruments and investments, precious metals and gemstones, jewelry, electronic equipment and other assets which may constitute the proceeds of the sale of narcotics" also includes a catch-all phrase that essentially swallows the detailed items in the other categories of the search warrant. Accordingly, the Court finds that this portion of the search warrant, particularly the phrase "other assets which may constitutes the proceeds of the sale of narcotics" is either unsupported by the Master Affidavit or not sufficiently particular or both.

The Defendants argue that because this portion of Attachment G essentially permitted the seizure of everything in their residences, the search warrant should be deemed to be a general warrant and all evidence seized in the search of their homes must be suppressed. The Court

69

disagrees. "[T]he remedy for an overly broad warrant is to sever the overly broad portions of the warrant from those portions that are sufficiently particular." United States v. Ford, 184 F.3d 566, 578 (6th Cir. 1999). Accordingly, in Greene, the court concluded that "severance of the 'catch-all' clause does not change the scope of the search or impugn the validity of the seizure" of evidence coming under the other sufficiently particular descriptions of items to be seized. Greene, 250 F.3d at 477. Thus, in the instant case, the Court finds that a part of category h., to wit "home furnishings, . . ., stocks, bonds, financial instruments and investments, precious metals and gemstones, jewelry, electronic equipment and other assets which may constitute the proceeds of the sale of narcotics" is overly broad, and that those items seized solely with respect to this language, and not coming within another category or the remainder of category h. or not seized pursuant to an exception to the warrant requirement, should be suppressed. The Court will address whether any of the items raised by Defendant Kevin Trent Bussell as being improperly seized fall within this language in the next section on the execution of the search warrant.[18]

*(3) Electronic Equipment*

        The Defendants also challenge the search warrant's authorization of the seizure of electronic equipment as being overly broad. Attachment G states [Doc. 204, Exh. 1] that the officers may seize

_____

        [18]Defendant Geneva Bussell does not point to any items of evidence that she contends were improperly seized in the search of her home. The Court has briefly reviewed the Inventory Listing of All Items Seized at Search Warrant Site [3:10-MJ-2153] for the search of her residence and finds that all of the items seized were either controlled substances, empty pill bottles, currency, firearms and ammunition, records and receipts relating to controlled substances or healthcare providers, computers, and a Ford Thunderbird and its vehicle registration. Accordingly, the Court finds that all of the items seized appropriately come within Attachment G.

o. Electronic equipment and their contents, containing information related to the transportation, ordering, purchasing, processing, storage and distribution of controlled substances, and the proceeds there from, including pagers (digital display beepers), telephone answering machines, electronic data organizers, telephone caller identification boxes, video and audiocassette tapes, CD's, DVD's and any stored electronic communications contained therein;

'for the time period December 31, 2006, though the present[.]" The Court finds that the attachment limits the seizure to only that electronic equipment that contains information regarding drug trafficking or the proceeds of drug trafficking since December 31, 2006. Agent Nelson states [Doc. 218, Exh. 3, ¶8.j.] in the Master Affidavit that based upon his experience and training, drug traffickers use electronic equipment to conduct their drug trafficking activities and to store information therefrom. The Master Affidavit also contains numerous references to Kevin Trent Bussell and Geneva Bussell using an electronic device, namely their telephones, in the drug conspiracy. Accordingly, the Court finds that the language permitting the seizure of electronic equipment is not overly broad and, instead, is as specific as the circumstances of the drug trafficking under investigation permit.

*(4) Photographs*

The Defendants contend that category q. of the attachments to the search warrants for both their Tennessee and Florida residences, which permits the seizure of photographs, is overly broad. Category q. reads as follows:

q. Photographs of all adults, vehicles, real estate, jewelry, currency, furs, boats, and/or substances having the appearance of narcotics, including still photos, negatives, videotapes, CD's, films, slides, undeveloped film and the contents therein[.]

The Court finds that the language of category q. serves to limit officer discretion. Officers are not

71

allowed to seize every photograph (or negative, videotape, CD, film, or slide) in the houses. Instead, they are only permitted to seize those photographs from December 31, 2006, forward, that might reveal evidence of the prescription pill trafficking conspiracy or of money laundering. For example, this language does not permit the executing officers to seize photographs of Kevin Trent Bussell's children or Geneva Bussell's minor grandchildren (unless the photograph also includes one of the specified person's or objects, like substances appearing to be narcotics).

The Master Affidavit provides a basis for the issuing judge to authorize the seizure of photographs of drug conspirators or proceeds. Agent Nelson states [Doc. 218, Exh. 3, ¶8.i.] that based upon his training and experience, "[d]rug traffickers take or cause to be taken photographs or video movies of themselves, their associates, their property and assets, and their product." The Master Affidavit also reveals [Doc. 218, Exh. 3, ¶24] that CS-1 made a video and audio recording of Kevin Trent Bussell meeting with coconspirators about visiting pain clinics and of drugs and proceeds in Bussell's Florida home. The affidavit does not state that this video was made without Bussell's knowledge. Accordingly, the Court finds that the Master Affidavit supports the seizure of photographs of coconspirators, drugs, or proceeds.

Although the group "all adults" in category q. is broad, it is not unpermissibly so. The Master Affidavit reveals that numerous coconspirators were in and out of Kevin Trent Bussell's Tennessee residence. In one intercepted telephone call [Doc. 218, Exh. 3, ¶51], Amanda Bible, Bussell's fiancée, complains about the number of people living in her and Bussell's home. The Master Affidavit also shows [Doc. 218, Exh. 3, ¶¶22, and 57-60] that a number of coconspirators were stopping by Geneva Bussell's home to deliver drug proceeds or pick up drugs. The Barto Affidavit establishes as many as thirty coconspirators [Doc. 220, Exh. 1, ¶¶11, 21, and 24] would

72

travel to Florida with Kevin Trent Bussell to engage in "doctor shopping" to acquire pills and would stay at one of Bussell's two homes while there. Given the number of unrelated adults in the residences in Florida and Tennessee, the Court finds that the seizure of photographs of adults taken after December 2006, is as limited as the circumstances of the drug trafficking under investigation permits.

*(5) Computers*

Finally, the Defendants challenge the search warrant's blanket authorization of the seizure of computers and all computerized data from their Tennessee residences. They argue that computes contain multiple gigabytes of data that would be unrelated to the drug conspiracy under investigation. Category u. of Attachment G permits the seizure of the following:

> u. Computer system hardware, including, but not limited to word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, and other computer related devices, and software, including floppy disks and any other medium which is capable of storing magnetic tape or optical coding, software programs, and any other programs, or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission, computer manuals relating to the operation of a computer system, computer software, and/or any related device relating to but not limited to the purchase, transportation, ordering, sale and distribution of illegal controlled substances and/or records, relating to the receipt and disposition of the proceeds from the distribution of illegal controlled substances

"for the time period December 31, 2006, through the present." Thus, the search warrants do not permit the blanket seizure of all computerized data but, instead, permit the executing officers to seize that data relating to drug trafficking or receipt or distribution of drug proceeds from January 2007 through November 2010. The Court finds that the Master Affidavit permitted the seizure of

computerized data relating to drug trafficking or drug proceeds. First, Agent Nelson states [Doc. 218, Exh. 3, ¶ 8.b.] that based upon his experience and training, drug traffickers often create records of their coconspirators, their sources of supply, their customers, money owed by and to them for drug sales, their drug supplies, and their transportation to acquire and sell drugs. Agent Nelson also relates [Doc. 218, Exh. 3, ¶ 8. J.] that "[d]rug traffickers often utilize electronic equipment, such as computers, . . . to generate, transfer, count, record, and/or store the information" described as records. Also, the Master Affidavit relates [Doc. 218, Exh. 3, ¶ 38] that during the traffic stop and search of Kevin Trent Bussell's truck, officer's seized computer printouts of travel directions to pharmacies in southern Florida. Accordingly, the Court finds that the Master Affidavit provides a basis to believe that the Defendants used their computers in relation to their drug trafficking activities.

The Defendants challenge the search warrants' authorization of the seizure of all of their computer data in order to obtain the data relating to drug trafficking. First, the Court observes that in order to retrieve the relevant data, the executing officers may properly *search through* all of the data on the computers in the Defendant's homes. The Sixth Circuit has held that officers executing a search warrant that authorizes the seizure of certain computerized data may seize the entire computer because it is "unreasonable" to expect police to search the computers for the relevant data in the defendant's home. Guest v. Leis, 255 F.3d 325, 334-35 (6th Cir. 2001). Accordingly, in Guest, the appellate court concluded that "[b]ecause of the technical difficulties of conducting a computer search in a suspect's home, the seizure of the computers, including their content, was reasonable in these cases to allow police to locate the offending files." Id. at 335. The Court finds that the seizure of computers from the Defendants houses in this case was also

74

reasonable under the circumstances to permit them to conduct an off-site search of the computerized data for the data that they were permitted to seize.

Accordingly, the Court finds that the search warrants for Defendant Kevin Trent Bussell's Tennessee and Florida residences and Defendant Geneva Bussell's residence were sufficiently particular, with the exception of the portion of Attachment G to the search warrants for the Tennessee residences authorizing the seizure of "home furnishings, . . ., stocks, bonds, financial instruments and investments, precious metals and gemstones, jewelry, electronic equipment and other assets which may constitute the proceeds of the sale of narcotics[.]" The Court finds that none of the items seized from Defendant Geneva Bussell's home were seized exclusively pursuant to this language. Accordingly, the Court recommends that Defendant Geneva Bussell's motion to suppress for overbreadth be denied. The Court finds that the above quoted portion of overly broad language in the search warrant for Defendant Kevin Trent Bussell's Tennessee residence does not require the suppression of all evidence seized from the home. Instead, the Court will address whether the overbreadth of this language should result in the suppression of any particular items seized from his home in the next section.

## C. Execution

Defendant Kevin Trent Bussell argues [Doc. 204] that during the execution of the search warrants for his Tennessee residence,[19] the executing officers seized items outside of the

_____

[19]Defendant Kevin Trent Bussell also raises this argument with regard to the search of his houseboat [Doc. 205] and his Florida residences [Docs. 206 and 207]. The Court has already found that the Defendant's suppression motion with regard to the search of his houseboat should be denied as moot, because no evidence was seized as a result of that search. Additionally,

scope of the search warrants. Specifically, he lists vehicle titles, receipts for furniture, keys to jet skis and safes, telephone and other bills, receipts for truck parts, and knives as being seized outside of the scope of the search warrants. He also contends that officers seized computers, which contained a large amount of data, the seizure of which was not authorized by the search warrants. He also argues [Docs. 204, 206 and 207] with regard to the searches of his Tennessee and his Florida residences, that the executing officers failed to note the time of execution on the search warrants in violation of Rule 41 of the Federal Rules of Criminal Procedure. The Government responds [Doc. 218] that the listed items were properly seized pursuant to the search warrant or under the plain view doctrine. Additionally, it contends [Docs. 218 and 220] that a copy of the "return" on the back of the search warrants reveals that the search warrants were executed in compliance with Rule 41.

*(1) Scope*

In his motion and at the May 13 hearing, the Defendant argued that the executing officers seized eight items or categories of items that were not authorized under the search warrant: (1) vehicle titles, registration, and payments; (2) receipts for furniture, truck parts, and other receipts; (3) telephone and other bills; (4) uncashed checks; (5) a folder containing trucking operator settlement summaries; (6) keys to a jet ski and a safe; (7) knives; and (8) computer data.

The Defendant first contests the seizure of certain vehicle titles, registration, and bills or invoices because the year of these vehicles is older than the limiting language in Attachment G,

---

Defendant Bussell fails to point the Court to any items that were improperly seized from his Florida residences. Accordingly, the Court cannot analyze whether the executing officers seized items outside of the scope of the search warrants for the Florida residences. Although the Government provided the inventory of items seized from the two Florida residences as an exhibit to its response [Doc. 220, Exh. 2], the Court declines the challenge of rummaging through this list and speculating upon which items Defendant Bussell believes are improperly seized.

76

which permitted the seizure of items "for the time period December 31, 2006, through the present[.]" The Defendant specifically points to invoices for a 2002 Sprint boat, a bill for a 2004 motorcycle, a 2005 Nissan Armada car title, vehicle registration for a 2006 red Chevy, a payment for a 2006 all terrain vehicle, a 2002 Yamaha title, a title for a 1995 Pontiac two-door car, a 1964 Chevy 2S title, and registration for a 2006 blue Ford truck. Category i. of Attachment G expressly authorizes the seizure of "[a]ll records related to vehicle purchases, auto titles, purchase invoices, [and] service records[.]" Category s. allows the seizure of documents indicating occupancy, residence or ownership of the premises, such as "titles and vehicle registrations[.]" The Government argues and the Court agrees that simply because a vehicle was made before December 31, 2006, does not mean that the Defendant purchased it before that time. Accordingly, the Court finds that the seizure of the listed vehicle titles, registration, and invoices or bills was not outside of the scope of the search warrant.

Next, the Defendant argues that the seizure of receipts for furniture, receipts from 2007 for truck parts, and various Wal-mart receipts (included in "misc. financial documents") violated the search warrant. Similarly, the Defendant challenges the seizure of telephone and other bills (such as an "ATT phone bill, . . ., sprint payments for 2009, . . . , payments to Kay jewelers, . . ., child support payments, Discover payments, Chase home financing payments" also listed under "misc. financial documents"). Paragraph j. of Attachment G permits the seizure of [a]ll financial statements, accounting records, receipts and invoices[.]" Category s. authorizes the seizure of "[i]ndicia of occupancy, residency, rental and/or ownership of the premisses described above or vehicles located thereon, including utility and telephone bills, . . . ." The Court finds that the seizure of the listed receipts and bills comes within the scope of the search warrant, particularly

given that the only dates given to the Court fall within the authorized time period.

The Defendant also contends that the seizure of uncashed checks was outside of the scope of the search warrant. The inventory [Doc. 204, Exh. 1, #5] reveals that officers seized "uncashed checks- Jessie Wilson and Tenn Child Support" from the top of the gun cabinet in the master bedroom. The inventory [Doc. 204, Exh. 1, #11] also states that the officers seized an "uncashed $500 check from Chester Wilder for Darien Perry[.]" Category m. of Attachment G to the search warrant permits the seizure of "[b]ank records, including . . . cancelled checks, . . . [and] bank checks[.]" The Court finds that uncashed checks fall within this category or in the broader category j., which permits the seizure of "[a]ll financial statements [or] accounting records[.]" Thus, the seizure of the uncashed checks was proper.

At the May 13, 2011 hearing, the Defendant listed "trucking operator settlement summaries" as being outside of the scope of the search warrant. The inventory [Doc. 204, Exh. 1, #19] states that officers seized a "Fed Ex folder containing trucking operator settlement summaries" from the closet of a bedroom in the Defendant's home. The Defendant did not present this folder for the Court's inspection or provide any explanation of the folder or its contents. Accordingly, the Court does not know what trucking operator settlement summaries are. To the extent that the folder contains summaries of payments to truckers from the Defendant's trucking business, the Court finds that the executing officers could properly seize the summaries as "business records" under category k. or as "accounting records, receipts, and invoices" under category j. of Attachment G.

The Defendant argues that the seizure of keys to his jet skis and his safe exceed the scope of the search warrant. The inventory [Doc. 204, Exh. 1, #11] of the items seized in the search of the Defendant's Tennessee home shows that the executing officers took a "Jet Ski key and a Safe

78

key" along with a bag of silver coins, various vehicle titles, bills and bank statements, and an uncashed check from a bedroom in the Defendant's residence. Category h. of Attachment G permits the seizure of "automobiles, boats, recreational vehicles, [and] other vehicles[.]" The Court finds that the executing officers could properly seize the key to the Defendant's jet ski along with the jet ski itself. Category t. allows "[t]he opening, search and removal, if necessary, of any safe or locked receptacle or compartment, including briefcases as some or all of the property heretofore may be maintained[.] The Court finds that the officers could properly seize a key to a safe as well as a safe under this provision.

The Defendant challenges the seizure of knives from his residence. The inventory [Doc. 204, Exh. 1, #40] states that the executing officers seized "5 case knive [sic.] boxes, ziplock bag full of case knives and filet knife . . ., a knikfe [sic.] roll iwth [sic.] 11 knives, mason's commen. knife" along with holsters and ammunition from under the sink in the master bathroom. Attachment G does not specifically authorize the seizure of knives. The only part of the Attachment under which the knives could have been seized is the catch-all phrase in category h., authorizing the seizure of "other assets which may constitute the proceeds of the sale of narcotics[.]" The Court has found in the particularity section above that this catch-all phrase is overly broad and that all items seized pursuant thereto should be suppressed. Accordingly, the Court finds that the listed knives were improperly seized.

At the May 13 hearing, the Government summarily argued that the officers properly seized the knives pursuant to the plain view exception. In order for evidence to fall within the plain view exception to the warrant requirement, the evidence in question must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place

79

from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." United States v. Roark, 36 F.3d 14, 18 (6th Cir. 1994) (citing Horton v. California, 496 U.S. 128, 136-37 (1990)); see also United States v. Bishop, 338 F.3d 623, 626 (6th Cir. 2003), cert. denied, 540 U.S. 1206 (2004); United States v. Bradshaw, 102 F.3d 204, 211 (6th Cir. 1996). In the present case, the agents were lawfully in the Defendant's residence executing the search warrants; however, the Court finds that the knives were not immediately incriminating. Although items seized pursuant to the plain view doctrine are not restricted to contraband, see United States v. Garcia, 496 F.3d 495, 512 (6th Cir. 2007) (approving the seizure of "zigzag papers, scales, and green plastic shrink wrap" under the plain view doctrine, when the search warrant only authorized the seizure of cocaine), there must be "'probable cause to associate the property with criminal activity.'" United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir.) (internal quotation omitted), cert. denied, 522 U.S. 925 (1997). In the instant case, the Court finds that the search warrant affidavit does not indicate that the Defendant used knives in the perpetration of the drug trafficking conspiracy, accepted knives in trade for controlled substances, or purchased knives with drug proceeds. Accordingly, the Court finds that the plain view exception does not apply because the incriminating nature of the knives is not immediately apparent. The knives must be suppressed.

Finally, the Defendant challenges the seizure of computers containing in excess of twenty gigabytes of data, much of which was not appropriately seized under the search warrant. The Court has already discussed above that the seizure of computers for off-site searches for the data listed in Attachment G was reasonable. See Guest, 255 F.3d at 334-35. Moreover, the Court observes that the Master Affidavit provides [Doc. 218, Exh. 3, ¶38] some indication that the Defendant used his computer to facilitate the commission of the drug trafficking crimes, as

computerized lists of pharmacies in Florida and directions thereto were found in the search of his truck when he was en route to a "doctor shopping" excursion in St. Petersburg. Accordingly, the computers were also properly seized as instrumentalities of the crimes.

After reviewing the items listed by the Defendant, the Court finds that only the seizure of knives from his Tennessee residence exceeded the scope of the search warrant. His Motion to Suppress No. 1 [Doc. 204] should be granted in part, only with respect to the suppression of the knives.

*(2) Rule 41*

Defendant Bussell argues [Docs. 204, 206, and 207] that the search warrants for his Tennessee home and Florida Residences were executed in violation of Federal Rule of Criminal Procedure 41(f)(1), because the executing officers failed to note the time that they executed the search warrants on the face of the warrants as required by the rule. The Government contends [Docs. 218 and 220] that the search warrants do in fact state the time of execution on the attached returns. Additionally, the Government asserts that the failure to write the time of execution on the face of a search warrant is a ministerial error that does not result in the suppression of evidence.

Rule 41(f)(1)(A) of the Federal Rules of Criminal Procedure provides that "[t]he officer executing the warrant must enter on it the exact date and time it was executed." The Government states that the back of the search warrant for Kevin Trent Bussell's Tennessee residence [Doc. 218, Exh. 1, p.2] states that the search warrant was executed on November 23, 2010, at "approx. 8:20 a.m." It states that the back of the search warrant for Kevin Trent Bussell's residence at 6081 38th Avenue North, St. Petersburg, Florida, [Doc. 206, Exh. 1, p.2] states that the search warrant was executed at 8:00 a.m., on November 23, 2010. The Government also relates that the

81

back of the search warrant for Kevin Trent Bussell's residence at 6065 38th Avenue North, St. Petersburg, Florida, [Doc. 207, Exh. 1, p.2] states that the search warrant was executed at 8:12 a.m., on November 23, 2010. The Court has checked these exhibits and confirmed that the search warrants were executed in compliance with Rule 41(f)(1)(A).[20]

### D. Fruit of the Poisonous Tree

Finally, Defendant Kevin Trent Bussell asks [Doc. 209] the Court to suppress ten automobiles, boats, and recreational vehicles seized on November 23, 2010, because this property is the fruit of the illegal searches of his Tennessee and Florida homes and his houseboat, as alleged in his motions to suppress Nos. 1 through 4. He contends that this property should be returned to him pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure, as the product of illegal searches. The Government responds [Doc. 226] that these items were seized pursuant to seizure warrants under criminal forfeiture law and were not seized as evidence under the search warrants for the Defendant's residences and houseboat. It contends that these seizure warrants were supported by probable cause that the property was subject to forfeiture and that a restraining order would be inadequate to assure the availability of the property for forfeiture.

Evidence obtained in derogation of the Fourth Amendment must be excluded from trial. Wong Sun v. United States, 371 U.S. 471, 485-86 (1963). This "fruit of the poisonous tree

---

[20]Although it is unclear whether Defendant Geneva Bussell is also advancing this argument, the Court has checked the search warrant for her residence [3:10-MJ-2153] and finds that the back side of the search warrant states that the warrant was executed at "approx 8:20 a.m." on November 23, 2010, and that a copy of the search warrant and inventory was left with Geneva Bussell.

doctrine" excludes not only that evidence that was illegally seized, but all evidence gained from the "'exploitation'" of an illegal search or seizure unless that evidence is sufficiently attenuated from the illegal actions as to "'purge[ it] of the primary taint.'" Id. at 488 (citing Maguire, Evidence of Guilt, 221 (1959)). The Court finds that the ten vehicles and watercraft listed by the Defendant do not come within the "fruit of the poisonous tree" doctrine for two reasons. First, the Court has not found that any of the searches of the Defendant's residences or houseboat violated the Fourth Amendment. Second, as the Government contends, the items listed by the Defendant were seized pursuant to their own seizure warrants, which were themselves based upon affidavits,[21] and not as a result of the searches of the Defendant's residences or houseboat or of any information gained during those searches. Accordingly, the Court finds that Defendant Kevin Trent Bussell's Motion to Suppress No. 5 [Doc. 209] should be denied.

---

[21]Nine of the vehicles and watercraft were seized pursuant to warrants issued based upon the probable cause in the Master Affidavit by Agent Nelson. The tenth vehicle, a turquoise BMW Z3, was seized pursuant to a seizure warrant issued based upon an affidavit [Doc. 226, Exh. 1] by IRS Agent Brian Grove.

## IV. CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds no basis to suppress the evidence seized in the searches of the Defendants' homes, with the exception of knives seized from Defendant Kevin Trent Bussell's Tennessee residence on November 23, 2010. For the reasons set forth herein, it is **RECOMMENDED** that Defendant Kevin Trent Bussell's Motion to Suppress No. 1 [**Doc. 204**] be **GRANTED in part**, in that the knives seized from his Tennessee residence should be suppressed because they were outside the scope of items for which the search warrant authorized seizure and they do not fall within the plain view doctrine, and the motion should be **DENIED in all other respects**. The Court recommends that the remaining suppression motions [**Docs. 172, 179, 195, 205, 206, 207, and 209**] be **DENIED**.[22]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.   

United States Magistrate Judge

---

[22]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

84